ROYAL TRUST CO. et al. v. EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 7, 1917.)

No. 144.

1. INSURANCE ⬥38—INSURANCE COMPANIES—CONSTRUCTION OF CHARTER—OWNERSHIP OF SURPLUS.

The charter of a stock life insurance company provided that holders of the stock might receive dividends thereon not to exceed 7 per cent. per annum, and that the earnings and receipts of the company over and above the dividends, losses, and expenses should be accumulated; also that the business of the company should be conducted on the mutual plan; that the officers should cause a balance of the affairs of the company to be struck annually, exhibiting its assets and liabilities, and also the net surplus, after deducting a sufficient amount to cover all outstanding risks and other obligations; and that each policy holder should be credited with an equitable share of the said surplus, to be applied as therein specified. *Held*, that such net surplus belonged to the policy holders, and that the stockholders had no interest therein which entitled them to an injunction restraining the company from using it for the purchase of its stock for retirement in carrying out a plan for its conversion into a mutual company as authorized by a state statute.

2. INSURANCE ⬥34—INSURANCE COMPANIES—CONVERSION FROM STOCK TO MUTUAL COMPANY—RIGHTS OF STOCKHOLDERS.

In the case of a life insurance corporation, whose net earnings do not belong to its stockholders, but to its policy holders, an owner of a majority of the stock does not stand in the same trust relation to minority stockholders as in ordinary corporations, and where the company is authorized by statute to use such earnings for the purchase and retirement of its stock and its conversion into a mutual company, such majority stockholder has the same right as the minority stockholders to negotiate for the sale of his stock and to obtain the best price possible therefor, in view of his controlling interest.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Royal Trust Company, Lucy Adaline Hurd Van Horne, Adaline Van Horne, and Richard Benedict Van Horne, as executors and trustees under the will of Sir William C. Van Horne, against the Equitable Life Assurance Society of the United States. From an order denying a preliminary injunction, complainants appeal. Affirmed.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Lord, Day & Lord, of New York City (Henry De Forest Baldwin and F. C. Nicodemus, Jr., both of New York City, of counsel), for appellants.

Alexander & Green, of New York City (Charles E. Hughes and Allan McCulloh, both of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

WARD, Circuit Judge. This is an appeal from an order of Judge Hough denying a motion for an injunction pendente lite. The bill alleges that the complainants are stockholders of the Equitable Life Assurance Society of the United States, which was incorporated in 1859 as a stock company under a general law of the state of New York enacted June 24, 1853, entitled "An act to provide for the incorporation of life and health insurance companies and in relation to the agencies of such companies." Laws 1853, c. 463. The capital consisted of 1,000 shares, of $100 each, fully paid and invested in securities deposited as required by law with the comptroller of the state of New York. The business authorized to be done was to make insurances on lives and to grant, purchase or dispose of annuities.

Article 3 of the charter reads:

"The capital of said company shall be one hundred thousand dollars in cash, divided into one thousand shares of one hundred dollars each, which shall be personal property, transferable only on the books of the company, in conformity with its by-laws. The holders of the said capital stock may receive a semiannual dividend on the stock so held by them, not to exceed three and one-half per cent. of the same; such dividends to be paid at the times and in the manner designated by the directors of said company. The earnings and receipts of said company, over and above the dividends, losses, and expenses, shall be accumulated."

Article 6, so far as material, provided:

"The insurance business of the company shall be conducted upon the mutual plan. * * * The officers of the company, within sixty days from the expiration of the first five years from December 31, 1859, and within the first sixty days of every subsequent period of five years, shall cause a balance to be struck of the affairs of the company, which shall exhibit its assets and liabilities, both present and contingent, and also the net surplus, after deducting a sufficient amount to cover all outstanding risks, and other obligations. Each policy holder shall be credited with an equitable share of the said surplus. Such equitable share, after being ascertained, shall be applied to the purchase of an additional amount of insurance (payable at death or with the policy itself), expressing the reversionary value of such equitable share at such interest as the directors may designate, or if any policy holder so direct, such equitable share of surplus shall be applied to the purchase of an annuity at such rate of interest as the directors shall designate, to be applied in the reduction of his or her future premiums."

This requirement was subsequently made annual. Under the law of New York at the time the Equitable Society was organized no purely mutual life insurance company could be incorporated. The law required a paid-up capital of not less than $100,000 to be invested in certain specified securities and deposited with the state comptroller at Albany. Such companies, however, were not prohibited from doing mutual business, that is, the insurance of persons who should be en-

titled to a ratable proportion of the surplus profits of the business, and the society does and always has done both participating and nonparticipating business, the former being by far the larger.

Section 95 of chapter 326, Laws of 1906, authorized the conversion of stock life insurance corporations into mutual corporations, and from that time the mutualization of this Society has been desired. July 19, 1917, a committee theretofore appointed by the board of directors reported a plan, and about the same time sections 16 and 95 of the Insurance Law (Consol. Laws N. Y. c. 28) were amended (Laws 1917, c. 301), no doubt in aid of the plan proposed by the committee, which was as follows: The Society is to purchase T. Coleman Du Pont's block of stock, consisting of 564 shares, paying him $5,400 per share for 501 shares and $1,500 per share for the remaining 63 shares and $1,500 per share for the 436 shares held by others if offered for sale within 90 days after the consummation of the plan, and a price not exceeding that sum if offered thereafter.

The purchase money for Du Pont's stock, amounting to some $3,-000,000, is not to be paid down, but in installments between November 1, 1917, and May 1, 1937, out of the interest payable semiannually by the Equitable Office Building Corporation on a purchase-money mortgage of $20,500,000 executed by the Building Corporation on land formerly belonging to the Equitable Society, on which it has erected an office building known as the Equitable Building. In addition, the Equitable Society is to release to the Building Corporation its right under a previous agreement to 9 per cent. of all dividends paid by the Building Corporation out of its surplus earnings on its common stock. All stock purchased is to be held by trustees, who are to vote the same until the whole capital has been acquired, whereupon it shall be retired and canceled.

Section 95 of the Insurance Law as amended permits any stock life insurance company to become a mutual company by acquiring its capital stock, provided the terms of purchase be approved (1) by the board of directors; (2) by a vote of the stockholders at a special meeting; (3) by a vote of the policy holders in person or by proxy at a special meeting called for the purpose; (4) by the superintendent of insurance. Section 16 of the Insurance Law as amended provides:

" * * * If a stock life insurance corporation shall determine to become a mutual life insurance corporation, it may, in carrying out any plan to that end under the provisions of section 95 of this chapter, acquire any shares of its own stock by gift, bequest or purchase. And until all of such shares are acquired, any shares so acquired shall be acquired in trust for the policy holders of the corporation as hereinafter provided and shall be assigned and transferred on the books of the corporation to three trustees and be held by them in trust and be voted by such trustees at all corporate meetings at which stockholders have the right to vote, until all of the capital stock of such corporation is acquired when the entire capital stock shall be retired and canceled and thereupon, unless sooner incorporated as such, the corporation shall be and become a mutual life insurance corporation without capital stock. * * * All dividends and other sums received by said trustees on said shares of stock so acquired, after paying the necessary expenses of executing said trust, shall be immediately repaid to said corporation for the benefit of all who are or may become policy holders of said corporation and entitled to participate in the profits thereof, and shall be added to and become a part of

the surplus earned by said corporation and be apportionable accordingly as a part of said surplus among said policy holders." Laws N. Y. 1917, c. 301, § 1.

The plan proposed by the committee was approved by the board of directors of the Equitable Society and afterwards by the stockholders at a special meeting, and the Society was about to call a meeting of the policy holders when the bill was filed. The bill charges that the proposed plan is illegal, because it has been so far carried through by the vote of a board of directors, elected by Du Pont and by a stock vote controlled by him; that the price to be paid by the Equitable Society of $5,400 per share, for 501 shares of his holdings is exorbitant and a waste of the company's surplus; that Du Pont by means of his stock control is bringing about an illegal discrimination in his own favor and in fraud of the minority stockholders; that he had no right to vote his stock; that, if section 95 of the Insurance Law permits these things to be done, it is unconstitutional and void. The prayer for relief is for an injunction pendente lite prohibiting the defendant, its officers, etc., from calling or holding a meeting of the policy holders to vote upon the proposed plan and from submitting the plan, if approved by the policy holders, to the superintendent of insurance for his approval, and that the plan may be adjudged illegal and void.

The defendant objects that the suit is premature, because the plan may never be carried out; the policy holders may not vote for it, and, if they do, the superintendent of insurance may not approve it. But the injury complained of is not only threatened, but the proceeding to accomplish it is actually under way. The complainants are not obliged to wait until it is consummated before asking for relief. If their contentions are right, equity should protect them by injunction.

The complainants' case is this:

First. That the stockholders are the owners of the Society's free surplus—that is, the surplus over and above what shall be necessary to cover all outstanding obligations, losses, and expenses—and are therefore injured by any waste of it, as, for example, by the purchase of Du Pont's stock control at an exorbitant price.

Second. That the proposed mutualization plan has been brought about by Du Pont's control of the board of directors and the meeting of stockholders held to consider it.

Third. That Du Pont has used his stock control to oppress the minority stockholders, by getting a higher price for 501 of his shares than they can get for theirs.

Fourth. That if sections 16 and 95 of the Insurance Law, as amended, authorize the purchase of Du Pont's stock on these terms and under these circumstances, they are unconstitutional.

[1] We are, however, satisfied that the proper construction of article 3 of the Society's charter is that the sole right of the stockholders is to receive semiannual dividends not exceeding 3½ per cent. on their stock, and of course the ownership of the securities deposited now with the superintendent of insurance at Albany, in case the Society were wound up and its debts paid. All the earnings over and above those dividends and losses and expenses are to be accumulated for the

benefit of the policy holders, necessarily the participating policy holders. This construction is confirmed by the provision in article 6 that the insurance business is to be conducted on the mutual plan and that every policy holder is to be credited with his equitable share of the net surplus. Complainants say that the business meant is that of participating policy holders and annuitants only, and does not apply to nonparticipating policy holders and annuitants. But it is the earnings of the Society's whole business, from whatever source, that are to be accumulated and to be credited, not to the stockholders, but to each policy holder, in proportion to his equitable share of the net surplus. This equitable share is evidently so much of the surplus of the annual dividend policies, as distinguished from the tontine or deferred payment policies (which receive their full share of the surplus of each class at the expiration of its fixed period), as may be prudently divided, with a view to the protection of all policies and annuities, and to protection against unforeseen losses, expenses, or contingencies.

Furthermore, the continuous practice of the Society from its incorporation down to the present time confirms this construction of the charter. The plan submitted at the original meeting of the projectors, the annual reports of the Society, its prospectuses issued to the public, its answers to official inquiries, all declare that it does a wholly mutual business; no part of the earnings, except dividends not exceeding 7 per cent. on their holdings, going to the stockholders. Therefore we think there is nothing in the complainants' claim that they as stockholders are injured in connection with the appropriation out of the Society's surplus to purchase Du Pont's stock, because they have no interest in the surplus whatever. If any one has a right to complain on this point, it is the participating policy holders and annuitants.

[2] We come now to the alleged violation by Du Pont of his trust relationship to the minority stockholders, in considering which it must be constantly borne in mind that we are dealing with a corporation whose stockholders do not own its surplus. A different conclusion would be reached in the case of an ordinary stock company. When the Legislature authorized stock life insurance companies to acquire their own stock, it must be taken to have authorized the usual negotiations between buyer and seller for the purchase, not all at one price, nor all at one time, but at various times and prices as the stock could be acquired. A stockholder who controls this Society has the same right to negotiate as a minority stockholder has. If the proposed plan had fixed a lump sum for the purchase of Du Pont's stock, without saying anything about the price to be paid for other stock, we do not see that there could have been any complaint. It is because the plan fixes a much lower price for minority stock that the complainants complain.

But it is common knowledge that stock sufficient to control a corporation is worth more than minority stock, and, though Du Pont's stock can never receive more than the very moderate dividend of 7 per cent., still its power to control the management of a company whose assets amount to nearly $600,000,000 confers a standing and influence which greatly increases its value. It has been the fear that this influence may

be improperly used that has caused the general and long-standing desire to put the control of the Society in the hands of the participating policy holders, who really own it. The history of the continued stock control shows its value. It was first sold by James Hazen Hyde to Thomas F. Ryan for $2,500,000; Ryan sold it to the late J. P. Morgan for about $3,000,000; Morgan sold it to Du Pont for over $4,000,000; and now Du Pont offers it to the corporation for about $2,000,000 less than he paid. Complete mutualization can never be carried through without Du Pont's stock, and it would be unreasonable to suppose that it can be acquired on the same terms as the minority stock. The inviolable equality of stock for which the complainants contend does not require that all stock shall be sold at all times at the same price.

These conclusions leave sections 16 and 95 of the Insurance Law as amended free from all attack in this case on the ground of unconstitutionality.

The general principles of law are not the subject of dispute. The cases cited by the complainants went off, so far as the purchase by a corporation of its own stock is concerned, on the construction of particular statutes and particular charters. Nor, in deciding that the stockholders do not own the surplus, need we consider just what the relations of the participating policy holders are to the company and to the surplus. What the complainants have to show in order to get relief is that they own the free surplus.

In Currier v. Lebanon Slate Co., 56 N. H. 262, the board of directors of an insolvent company purchased shares of a subscriber, who had not paid in full for the purpose of relieving him of liability. This was held illegal, and an unfair distribution of the company's assets.

In Berger v. U. S. Steel Co., 63 N. J. Eq. 809, 53 Atl. 68, an offer of the company to purchase its preferred stock with its 5 per cent. bonds was held to be a fair distribution of assets, because it was made to all the preferred stockholders without discrimination. This was the case of a stock corporation whose assets belonged to the stockholders.

In Robotham v. Insurance Co., 64 N. J. Eq. 673, 53 Atl. 842, under a statutory authority to invest, persons who controlled a stock corporation appropriated $8,000,000 out of its surplus to get control of a second stock corporation for the purpose of perpetuating their control of the first corporation. In a suit by a stockholder this was held to be illegal.

In Greeff v. Equitable Life Assurance Society, 160 N. Y. 19, 54 N. E. 712, 46 L. R. A. 288, 73 Am. St. Rep. 659, the holder of a tontine policy for $20,000 in this company brought an action at law to recover an amount in addition to the share of the surplus paid him on the ground that the whole surplus should have been awarded. The court held that, as his policy provided the company should determine the amount to be distributed, the action could not be maintained, in the absence of bad faith, willful neglect, or abuse of discretion.

In Equitable Life Assurance Society v. Brown, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682, the holder of a participating life policy of this company brought a suit in equity, alleging that the defendant had wasted, misapplied, and misappropriated the surplus, and praying for

the appointment of a receiver and an administration and distribution of the fund by the court. It was held that such misappropriation and waste by the previous administration of the company were no ground for equitable jurisdiction; that the bad faith mentioned in the Greeff Case meant, not waste nor misappropriation of the company's assets by the company's officers and others, but bad faith in the distribution between policy holders of the same class.

In neither of these cases, nor in any similar case to which we have been referred, did the question arise whether the accumulated profits under this or any similar charter belong to the stockholders or to the participating policy holders.

The complainants urge that we should maintain the status quo until final hearing at least by enjoining delivery of schedule B, providing for the payment of installments of the purchase price of Du Pont's stock out of the interest due by the Building Corporation on its mortgage and the delivery of the release, schedule C, of the Equitable Society's right to 9 per cent. of the dividends paid by the Building Corporation on its common stock. It is said that this course will be of little disadvantage to the defendant, which by the eighth article of the agreement of sale is subject, in case of delay in delivering schedules B and C, only to the payment of interest at 5 per cent. on any installments payable to Du Pont before actual delivery; whereas, on the other hand, if the plan is presently consummated, they will be under great difficulties if they prevail at final hearing.

The complainants' contentions are too doubtful to justify us in doing this, and the order is therefore affirmed.