191 P.2d 734

**JACOB et al. v. MINER.**

No. 4928.

Supreme Court of Arizona.

March 22, 1948.

Lewkowitz & Wein, of Phoenix, for appellants.

Wilmot W. Trew, Stockton & Karam and Emmett R. Feighner, all of Phoenix, for appellee.

UDALL, Justice.

Abdoo H. Jacob, one of the appellants, was the sole owner of certain property located at 1924 East Van Buren St., described as Lots 1, 2, 3, and 4 of Block 1, Montezuma Place, this being an addition to the City of Phoenix, then in use as an auto court. The permanent improvements thereon consisted largely of four tourist court cabins, two houses (one referred to herein as the "brown house" and the other as the "white house"), and a gas station. One of the lots was used to carry on the business of buying and selling house trailers and on one corner privately owned trailers could be parked for a rental charge. On October 27, 1945, Jacob entered into a written agreement with the appellee, Glenn E. Miner, to sell all of said property to the latter for the sum of $32,500, possession to be given on December 1, 1945. Pursuant to the agreement, $500 earnest money was then paid, and on December 1 a payment of $11,500 was made in cash and two notes ($3,000 due January 10, 1946, and $17,500

due on or before three years from January 10, 1946) were executed and delivered.

The seller having failed to deliver possession on December 1, 1945, as agreed upon, of either the "brown house" or the "white house", the purchaser shortly thereafter brought an action for forcible detainer to obtain complete possession of the premises. The parties will hereafter be referred to as they were in the lower court, Miner as plaintiff and Jacob et ux. as defendants.

We deem it unnecessary to detail the pleadings and the various amendments thereto. Suffice it to say that the case went to trial on plaintiff's first amended complaint (containing three entwined causes of action), wherein he sought to recover: (a) possession of the "brown house"; (b) damages in the sum of $11,200 for failure of consideration due to nondelivery of the "good will" and other personal property, as well as punitive damages because of the wilful, wanton, and intentional acts, words, and conduct of defendant Jacob; and (c) damages in the sum of $25,000 for loss of earnings in plaintiff's other business. Defendants also sought damages against plaintiff on an amended cross-complaint. The court summarily directed a verdict in favor of plaintiff on the forcible detainer matter covered by the first cause of action, and by their other verdicts the jury found against defendants on their cross-complaint and in favor of plaintiff on his second and third causes of action. Judgment was entered in accordance with the verdicts, and from this judgment and an order overruling defendants' motion for a new trial, this appeal was taken.

 It is now urged that this action having been originally brought in forcible detainer it was error for the court to permit amendment of the pleadings to encompass damages for breach of contract, etc., citing our ruling in Olds Bros. Lumber Co. v. Rushing, 64 Ariz. 199, 167 P.2d 394. The principle contended for is correct, but as we said in the case of Neyens v. Donato, 67 Ariz. 1, 188 P.2d 588, it is of no avail to defendant because one who has participated, as he did, without objection, in the trial of such issues even filing a cross-complaint of his own, cannot now be heard to complain. Furthermore a question not presented to the trial court cannot be raised for the first time on appeal. City of Glendale v. Coquat, 46 Ariz. 478, 52 P.2d 1178, 102 A.L.R. 837.

Defendants (appellants) present fourteen assignments of error and ten supporting propositions of law. The legal questions thus raised together with such additional facts as may be found necessary to a determination of this appeal will be set forth as we proceed.

One of the grounds urged as a basis for a new trial was the uncontroverted fact that one of the jurors, who later became their foreman, made a short visit during the trial to the auto court here in question. By appropriate assignments it is now con-

tended that where a juror makes an unauthorized visit to the premises in litigation such act constitutes misconduct which would compel a trial court to grant a new trial.

There is no hard and fast rule governing such matters, as each occurrence must be judged upon the circumstances of the particular case. Much must necessarily be left to the discretion of the trial court as it is in a better position than is the appellate court to determine the effect of the irregularity upon the result of the trial. Tunmore v. Macleish, 45 Cal.App. 266, 187 P. 443. See also 46 C.J., section 101, page 143, and 39 Am.Jur., New Trial, section 78, page 91 et seq.

In the case of Webb v. Hardin, 53 Ariz. 310, 89 P.2d 30, a juror had visited the scene of the accident during the trial of a personal injury case for the purpose of determining whether the testimony given in regard to the visibility at such place was correct. While we branded the conduct of the juror as being highly improper, we held that the refusal of the trial court, under the circumstances there shown, to grant a new trial was not reversible error, citing two criminal cases, Lawrence v. State, 29 Ariz. 247, 240 P. 863 and Sam v. State, 33 Ariz. 383, 265 P. 609, in support thereof. Here it was more the past conduct of the parties rather than the physical condition of the premises, at the time of trial, that was the important factor in the law suit; hence, we cannot say the prejudice

to the defendant seems affirmatively probable by reason of tne improper visit of the juror. There is nothing in the numerous affidavits submitted on the motion for a new trial to indicate that the juror was in any way prejudiced or influenced by the fact that he drove by and for approximately 10 or 15 minutes examined the premises; there is no showing that he conversed with his fellow jurors about his unauthorized visit. In view of the fact that the verdict was unanimous and the experienced and learned trial judge, by denying the motion for a new trial, determined that no prejudice had resulted, we are not disposed to disturb his ruling. Another factor enters into our ruling; i. e. the defendants by their affidavits establish that they knew of the visit of the juror now complained of before the trial of the case was concluded and yet failed to report the same to the court. Evidently they chose to gamble upon any effect the juror's inspection might have on a verdict, and after it was adverse for the first time in their motion for a new trial they apprised the court of the juror's misconduct in their effort to overturn the jury's verdict. Such laxness should not be rewarded. The trial court did not commit prejudicial error or abuse its discretion in denying defendants' motion for a new trial.

Defendants by their cross-complaint sought possession of the "white house" and damages in the sum of $5000 for the withholding of same. The cross-complaint was grounded upon the provisions in the agree-

ment giving defendant Jacob an option (which he later attempted to exercise) to rent the "white house" and the adjoining vacant lot where his business of buying and selling house trailers was carried on. The uncontradicted evidence adduced at the trial showed that one Cherry was occupying the "white house" when the contract of sale and purchase was entered into and at all times thereafter, though this occupancy was not known to plaintiff when he signed the agreement. Cherry refused to surrender possession of this house until defendant Jacob made settlement with him, which settlement apparently had not been made up to the time of trial. When defendant (cross-complainant) attempted to prove his losses as a result of not being given possession of the "white house", the court sustained the objection of plaintiff (cross-defendant) to such evidence. This issue was withdrawn from the consideration of the jury by the court's instructing them as follows: "With respect to the damages for loss of use of the white house, ladies and gentlemen, you are instructed that under the terms of the deed and of the agreement, which I spoke to you about a few moments ago, it was the duty of Mr. Jacob to turn over to Mr. Miner such possession of those premises, including the white house, as would enable Mr. Miner to comply with his option agreement to lease the same to Mr. Jacob, and under all the evidence in this case, there being no dispute in the evidence upon that point, such possession was not given to Mr. Miner, and therefore Mr.

Jacob cannot recover any damages for the loss of the use of the white house."

The ruling that defendants were entitled to recover neither possession of the "white house" nor damages for being deprived thereof is assigned as error. We believe the trial court properly held that it was defendant's duty first to deliver possession of the white house to plaintiff before he could claim under his option a right to possession of said premises, or claim damages for not being given its possession. To hold otherwise would permit defendant to avoid full performance of the vendor's obligation to convey as contained both in his agreement and the deed of conveyance. Nor do we believe that under the circumstances of this case the fact that defendant paid rental to plaintiff for the white house waived the condition precedent or his breach of the contract. The rule announced in the case of Pima Farms Co. v. Fowler, 32 Ariz. 331, 258 P. 256, syl. #1, is not apropos to this situation. Up to the time of trial the plaintiff had been deprived of possession of both the "brown house" and the "white house". There is no merit to this assignment.

■ Defendants attack the verdict and judgment, for damages in the sum of $2200, returned and granted upon plaintiff's third cause of action on the ground that the damages allowed were not substantiated by competent evidence but were based upon speculation and conjecture. The basis of the damages sought by plaintiff on this cause of action is that defendants were

fully apprised at the time the agreement was entered into that plaintiff would require by December 1, 1945, that portion of the premises known as the "brown house" for the purpose of installing a resident manager to manage and conduct the operations of the entire premises including the contemplated general improvements and the erection of additional cabins thereon; and that defendants had failed and refused to deliver to plaintiff possession of the "brown house", and had entered into a course of conduct wtih a fraudulent and unlawful intent to bring about a condition whereby plaintiff would be unable or unwilling to consummate the purchase of the premises and would ultimately be compelled to abandon the contract of purchase and sale and forfeit the payments theretofore made.

Stating the facts in the light most favorable to plaintiff, which is in support of the judgment, it is clear from the evidence that at the time of entering into the agreement defendants were advised that plaintiff was a travelling salesman for the Commericial Clearing House, his territory embracing the states of Arizona, New Mexico, and a part of Texas, and that his business would require that he spend a great deal of his time away from Phoenix, thereby making it imperative that he have possession of the "brown house" so that his manager could properly look after his interests in the property. It was further shown that plaintiff was investing all of his capital in this business venture and that a good part of the balance due on the purchase price would necessarily come from his earnings as a salesman. The subsequent misconduct of defendant Jacob was such that plaintiff was required to stay in Phoenix to protect his investment as a result of which his income was materially decreased, and by reason of his non-attention to the business of his employer the Texas and New Mexico territory was taken from him, leaving him only the territory in Arizona.

The general rule as to damages for the breach of contract is:

"As a general rule, sometimes expressed in statutory enactments, the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof. * * *

"In the application of the rule it is held that the parties will be presumed to have contemplated that the party injured by the breach of the contract would sustain such damages as would fairly and substantially, in the usual course of things, result from such breach, in the light of all the facts known or which should have been known to them; and the damages recoverable in an action for breach of contract are for this reason sometimes more remote than those recoverable for a tort." 25 C.J.S., Damages, § 24.

116

It is a well established rule in this state that loss of profits from the destruction or interruption of an established business may be recovered if the amount of actual loss is rendered reasonably certain by competent proof. Jacobson v. Laurel Canyon Mining Co., 27 Ariz. 546, 234 P. 823; Matson v. Bradbury, 40 Ariz. 140, 10 P.2d 376; Rio Grande Oil Co. v. Pankey, 50 Ariz. 529, 73 P.2d 707; Martin v. LaFon, 55 Ariz. 196, 100 P.2d 182. The same rule is recognized in the Federal Courts, see Anvil Mining Co. v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814; Weinman v. De Palma, 232 U.S. 571, 34 S.Ct. 370, 58 L.Ed. 733.

The Supreme Court of the United States in the case of Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544, clearly points out the distinction between cases in which the evidence as to the fact of the damage is uncertain and those in which the fact of the damage is clearly established, the uncertainty existing only as to the extent of the damage, in these words:

"It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

This distinction is fundamental for where, as here, it clearly appears that a party has suffered damage, a more liberal rule should be applied in allowing the court or jury to determine the amount of the damage than should be applied in weighing evidence on the question of whether or not the acts complained of will result in any damage at all to the party upon whom rests the burden of proof.

We are of the opinion that the evidence in this case fully establishes, by competent evidence, the fact of plaintiff's damage for loss of earnings as a salesman for Commercial Clearing House, and reasonably establishes the extent thereof.

The gist of plaintiff's second cause of action, which arises ex contractu, can best be stated by quoting the following portion of the complaint, viz.:

"That at the time of executing said agreement of October 27, 1945 the defendant, Abdoo H. Jacob, had then determined that he would never in fact sell the properties he agreed to sell by said agreement and that he would harass, intimidate and annoy the plaintiff by threats which he made of doing personal violence to plaintiff and by threatening, annoying and intimidating the tenants in the business and by dis-

connecting the utilities and destroying facilities available and provided for the comfort, convenience and enjoyment of the guests and tenants of the business and by building spite fences and scattering unsightly junk and debris on and about the premises and more particularly by refusing to deliver possession on December 1, 1945 or any time thereafter to the plaintiff, as he agreed to do by said agreement, possession of the manager's house, hereinbefore described, and of the "white house", hereinbefore described. The said defendant Abdoo H. Jacob, did, after the execution of said contract of purchase and sale, notify the tenants and guests of said business to vacate and remove themselves therefrom, and has by a continuing daily course of action made it difficult and unhappy for the tenants and guests of said business; and in addition to himself has placed with him in the manager's house a man named Hall with his wife and five children, and is allowing them to live in one room, altogether, in said manager's house, thus further creating an intolerable condition to the peaceful and happy enjoyment of the facilities of said business by the tenants and guests thereof, all with the design and purpose to destroy the good will of the said going and operating business which the said defendant, Abdoo H. Jacob, sold to the plaintiff * * *. That defendant's said acts and conduct commencing upon the execution of said contract by design theretofore conceived, as herein alleged, and continuing constantly since the execution of said contract has wholly destroyed the said good will of said going and operating business, and the conduct of the said defendant has deprived the plaintiff of the entire and whole benefits and worth thereof. That the said acts of said defendant were and are willful, intentional and malicious. That by virtue of said willful, intentional and malicious acts of the said defendant the consideration for the sale of said properties to the extent of $11,200.00 has wholly failed and the plaintiff has been damaged in consequence in the sum of $11,200.00."

The written agreement between the parties provided "It is understood that of the above purchase price ($32,500) $12,000 is for Good Will and furnishings as herein above suggested". The evidence offered by plaintiff showed that the furnishings were worth not more than $800. The learned trial judge, while expressing some doubt as to the correctness of his ruling, denied defendant's motion for an instructed verdict on this cause of action and permitted same to go to the jury. The verdict was for $11,200 actual damages (full amount prayed for) and $2,000 punitive damages.

The sordid story which unfolds from a reading of the transcript of testimony makes it readily understandable why the jury returned such a substantial verdict against defendant Jacob for both actual and punitive damages. Defendant had sold this business with its "good will" separately listed and valued, yet after receiving in

cash more than one third of the purchase price he immediately started upon a shocking course of conduct with the evident purpose of making the "going so tough" for the purchaser that he would fail to complete the performance of the contract and thereby forfeit the investment already made. According to the evidence, only partial possession of the premises was given; water and sewer pipes were disconnected; the lighting system interfered with; trash piled around to make the place unsightly; attempts made to evict some of the tenants; young hoodlums, brought by defendant to the place, disturbed the peace and quietude of the neighborhood to the extent that peace officers had to be called on several occasions, and one tenant even armed himself and kept watch to protect his family for a period of a week. As one witness testified, "the whole atmosphere was one of continued excitement—nobody knew what was going to pop". Judged by their verdict the jury evidently believed that this conduct was wanton and malicious and that defendants should respond in damages therefor.

Defendants urge that the verdict and judgment on this cause of action were contrary to law and to the evidence, and that the court erred in denying them a directed verdict for the reason that there was no evidence supporting damages on account of loss of good will. This contention is largely based upon the following portions of the transcript.

In response to this question propounded by the court: " * * * What did you understand you were purchasing as the good will of the business for $12,000?" the plaintiff answered: "Well, I understood it to consist of the profits, the operating, going * * * the operating and going business that would result in earnings." Defendant Jacob, however, maintained that it was upon the insistence of plaintiff that the phrase "good will" was used in the contract and that he understood it to mean "the investment in the improvement I made on the place".

The plaintiff definitely stated that, in spite of defendant's conduct, the auto court business operated at full capacity at all times and that he suffered no loss of income as a result thereof, his testimony on cross examination in this respect being as follows:

"Q. Mr. Miner, those cabins have been occupied all the time, haven't they? A. Yes.

"Q. They were occupied fully when it was turned over to you? A. That is right.

"Q. And they have been occupied ever since, haven't they? A. That is right."

He further stated in answer to questions of his counsel:

"Q. Now, counsel speaks of places being filled up. Do you know whether or not there exists in this community an emergency in which there is a great shortage of

accommodations? A. I could rent forty times that many places every day.

"Q. In other words, you could oust all these tenants and replace them, no matter how you did it, two or three times a day? A. I could put four beds in each cottage and rent them."

And the plaintiff further testified:

"Q. Well, now, let's see if it did. Did you have any vacancies there during that time? Did people move out? A. No.

"Q. They all stayed there? A. Yes.

"Q. Paid their rent? A. Yes.

"Q. You sustained no loss as a result of it, then, did you? A. A great deal of loss resulted.

"Q. What? A. A great deal of loss resulted.

"Q. No loss as far as the income from that property was concerned? A. That is right."

On this state of the record the defendant advances this proposition of law: "Where a cause of action is based upon a violation of a particular portion of a contract and damages are sought for breach of said contract, and the plaintiff testifies as to the meaning of said portion of the contract claimed to have been breached, and further testifies that he suffered no damages as a result of said breach, if any, then the court should direct a verdict against the plaintiff on his cause of action."

While there are times when it is important to determine just what meaning the parties intended to convey when a particular word or phrase is used in a contract, we do not believe this to be one of them. An attorney representing both the parties in drawing this contract used the phrase "good will" which term has a well-recognized meaning in the law, and to decide one of the vital phases of this litigation on the basis of plaintiff's statement that he understood good will to mean profits would be manifestly improper and unfair, particularly when his definition was at least partially correct.

"The distinction has been stated that profits are the gains realized from trade while good will is that which brings trade." 38 C.J.S., Good Will, § 1.

There are many definitions of good will.

" * * * Of all such definitions the narrowest is probably that of Lord Eldon, who defined good will as 'the probability that the old customers will resort to the old place.' The doctrine of good will proved to be so salutary in effecting just results that it has been constantly expanding so that the definition itself has broadened with the development of the doctrine. The narrow view of Lord Eldon's definition is generally disapproved in the light of present-day conditions. Approval is given either to the definition of Vice-chancellor Wood, that good will includes every positive advantage acquired, arising out of the business of the old firm, whether connected with the prem-

ises where it was carried on, with the name of the old firm, or with any other matter carrying with it the benefit of the business of the old firm, * * *". 24 Am.Jur., Good Will, sec. 2.

Speaking generally, good will is a "fleeting, intangible something", Lawson v. Household Finance Corp., 17 Del. Ch.Rep. 343, 152 A. 723, 728. It is not corporeal property, Sheldon v. Houghton, 21 Fed.Cas. pages 1239, 1241, No. 12, 748. Stated in another way, "good will" is that asset, intangible in form, which is an element responsible for profits in a business, Pett v. Spiegel, Sup., 202 N.Y.S. 650, 655. It is true that a good will of a business may be a valuable asset and is a subject of bargain and sale, Rotan v. United States, D.C. Tex., 43 F.2d 232, 235. However, "Good will exists as property merely as an incident to other property rights and is not susceptible of separate ownership or disposition. * * *" 38 C.J.S., Good Will, § 3. Commonly, the purchaser's remedies for the seller's failure to deliver the business and its good will are the same as those arising from the breach of any other contract of sale, 38 C.J.S., Good Will, § 16; i. e., rescission of the contract, suit for specific performance, injunction to enforce restrictive covenants, an action for damages for breach of contract, or an action in tort.

"There is no principle of law making any distinction between good will and other property with respect to the right of the owner thereof to recover damages for its impairment or destruction. Accordingly, when the seller of good will breaches any of the conditions of his contract, the injured person is entitled to damages. * * *" 24 Am.Jur., Good Will, sec. 28.

The measure and elements of such damages are stated to be:

"The rule for measuring damages for injury to or destruction of good will is the same as that for measuring damages for injury to or destruction of any other personal property. And following the ordinary rule for computing damages for the breach of a contract, they must be such as result naturally and proximately from the breach, excluding speculative and conjectural damages. While the measure of damages is usually difficult of exact computation, this will not preclude a recovery. Generally speaking, in actions for breach of contract, the measure of damages is not the amount of profits which the defendant may have realized from the breach, but the injury which the buyer has sustained, which may include loss of profits and diminution in value of the property purchases. * * *" 24 Am.Jur., Good Will, sec. 29.

It will thus be seen that there are many elements which enter into good will, not all of which are necessarily present in every case and, hence, damages are not limited to a showing of loss of current profits or diminution in value. Other factors are here present, such as defendants' failure to deliver complete possession thus constituting deprivation of full use and enjoyment of

the property; conduct causing loss of anticipated future profits over a period of years; partial interruption of business and injury to or destruction of the property sold; disturbance of peaceable enjoyment of the premises by annoyance and harassment; and deferment of planned extensive improvements.

While defendants deny many of the improper acts charged against them, primarily they rely upon plaintiff's admission that there was no loss of profits, and no showing of diminution of value, for a reversal of the judgment. The matter of an acute shortage of housing in the Phoenix-Salt River Valley Defense Area and the constantly rising market in realty values are all that prevented serious damage on these scores; however, as heretofore pointed out, there are other factors present which will sustain a judgment for damages.

"A sale of a business and its good will carries with it the implied obligation that the seller will in good faith do nothing to injure the good disposition of the public to the old business, or impair the advantages and benefits which the purshaser has acquired by the purchase of the good will." 38 C.J.S., Good Will, § 7.

■ The conclusion is inescapable that it was the purpose and intent of defendants not to deliver the good will (that which they had solemnly covenanted. to sell). To the contrary their acts were calculated seriously to impair if not wholly destroy same. The jury found that such acts were in fact damaging to this plaintiff from a monetary as well as a full enjoyment of his property standpoint, and we believe the evidence sustains such findings. For the jury and trial court to have held otherwise would have been less than realistic; hence, there was a partial failure of consideration. The fact of damages being established, the uncertainty exists only as to the extent of the damage, and, as we pointed out in our discussion of the previous assignment, much more latitude is then allowed in determining the amount to be assessed.

■ Having concluded that the evidence does support a verdict for compensatory damages, it is unnecessary for us to consider the companion assignment that judgment for punitive damages should be reversed, though we concede the correctness of defendants' proposition of law that actual damages must be found as a predicate for recovery of exemplary damages. Warfield v. Krueger, 96 Cal.App. 671, 274 P. 764.

■ While we are reluctant to disturb the jury's findings as to the amount of damages awarded, we are of the opinion, considering that the customary loss of profits and diminution of value were not shown, an allowance of one hundred per cent of the actual damages sued for is not justified. Doubtless the jury were motivated more by the unconscionable conduct of the defendants rather than an application of calm judgment and dispassionate reason to the facts of the case.

Under the provisions of section 21-1833, A.C.A.1939, this court is expressly given the right to decrease the amount of damages allowed where we deem it excessive. See Standard Oil Co. of California v. Shields, 58 Ariz. 239, 119 P.2d 116. It is, therefore, ordered that if plaintiff shall within thirty days file a remitter in this court of all that portion of the judgment for actual damages on plaintiff's second cause of action in excess of $5,000 the judgment will in all respects be affirmed. Otherwise the judgement on the second cause of action will be reversed and that cause of action remanded for a new trial.

STANFORD, C. J., and LaPRADE, J., concurring.