COPLAND and wife, Respondents, v. DEPARTMENT OF TAXATION, Appellant.

*April 6—May 4, 1962.*

544

545

546

548

550

For the appellant the cause was argued by *E. Weston Wood,* assistant attorney general, with whom on the briefs were *John W. Reynolds,* attorney general, and *Harold H. Persons,* assistant attorney general.

For the respondents there was a brief by *Aberg, Bell, Blake & Metzner* of Madison, and oral argument by *George G. Blake* and *William J. P. Aberg.*

CURRIE, J. In order to better understand the questions here presented we deem it necessary to first examine the 1947 transactions. Since the purchasers of the 75 percent interest in the old corporation paid $1,050,000, that was their tax basis in the stock acquired. None of these stockholders were residents of Wisconsin, and the ensuing transactions were conducted with little, if any, regard for Wisconsin law. Apparently, the plan was to write up the corporation's assets to the level reflected by the price paid therefor by the Thomson group. On this basis the total net assets were valued at $1,400,000. The majority shareholders could do this without paying any tax upon the increase because it merely brought these assets up to their basis in the stock.

Thus, the majority intentionally avoided qualifying the transaction as a tax-free reorganization under the Internal Revenue Code. This was the reason for temporarily operating the business as a partnership rather than directly as a new corporation. In so doing, the majority achieved their purpose in that the transaction did not qualify as a tax-free

reorganization under the federal law, the basis of the assets to the new corporation was set to reflect the majority taxpayers' bases in their stock, and no federal tax liability was incurred by the majority shareholders. The result also afforded the tax advantages involved in increased allowances for depreciation, because of the revaluation of the physical assets, and in large deductions for interest paid on the debentures. The new corporation was capitalized in a manner referred to as a "thin incorporation." Under this setup, the proportion of debt to equity is high, and this enables the shareholders to withdraw earnings and surplus of the corporation as interest and repayment of debentures without subjecting it to corporate taxation. Thus, double taxation was avoided as to the interest payments and all taxation was avoided on the repayment of the debentures to the majority (because their basis was equal to the face value).

Upon this appeal the board's determination, that the transaction did not qualify as a tax-free reorganization under Wisconsin law, has not been challenged. The issues presented are:

(1) Did the Coca-Cola franchise possess value at the time of liquidation?

(2) What is the proper scope of judicial review of an administrative agency's findings of fact?

(3) Did the trial court err in setting aside the finding by the board that each of the two petitioners received assets of the value of $175,000 upon liquidation of the old corporation, which in turn is grounded upon a determination that the total goodwill of the corporation had a value upon liquidation of $1,031,055.77?

*Franchise as an Item of Value on Liquidation.*

For purposes of this decision, we consider that all the potentially taxable goodwill is embodied in the Coca-Cola franchise. This is because any goodwill resulting from peti-

tioners' personal reputation and management ability was not an item transferred by the corporation upon liquidation.

Petitioners cite two federal tax court cases where franchises surrendered by corporations upon their liquidation, and reissued to the businesses in a new form, were held not a proper element of value in computing the gain on dissolution. *Akers v. Commissioner* (1946), 6 T. C. 693; *Savidge v. Commissioner* (1945), 4 TCM 545 (CCH). The facts of the instant case are readily distinguishable from these two cited cases. Here the franchise was not terminable at the will of the issuing corporation, and the franchise was held by the corporation rather than personally by its owners. Madison Coca-Cola Bottling Company surrendered its franchise only upon the express condition that the business, operating in a new form, would be issued a new franchise. Thus, issuance of the new franchise was not a matter of grace by Coca-Cola but was attributable to the conditional surrender by the old corporation. We think that the franchise, in effect, was thereby transferred to the partnership upon dissolution of the corporation and that its value should be included in determining the gain to petitioners upon dissolution of the old corporation. In some situations it might be necessary to segregate the value of a franchise from the other goodwill. However, as noted above, in this case we treat the value of the franchise as encompassed in goodwill.

### Scope of Review of Agency Finding.

The majority and dissenting members of this court are in full agreement as to the principles of law governing the scope of judicial review of an agency's findings of fact under the Wisconsin Administrative Procedure Act (ch. 227, Stats.). The controlling statute is sec. 227.20 (1) (d), which authorizes a reviewing court to reverse or modify an agency decision if substantial rights of the aggrieved party have been prejudiced as a result of the administrative find-

ings being *"unsupported by substantial evidence in view of the entire record as submitted."* (Italics supplied.)

Thus, to apply this standard we must first determine what is meant by "substantial evidence." E. Blythe Stason, in an article entitled "Substantial Evidence" in Administrative Law, 89 University of Pennsylvania Law Review (1941), 1026, 1038, states:

"[T]he term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside."

This court, in *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 405, 406, 34 N. W. (2d) 238, quoted from *Consolidated Edison Co. v. National L. R. Board* (1938), 305 U. S. 197, 59 Sup. Ct. 206, 83 L. Ed. 126, to the effect that "substantial evidence" is "such relevant evidence as a *reasonable mind* might accept as adequate to support a conclusion." (Emphasis supplied.)

We deem that the test of reasonableness is implicit in the statutory words "substantial evidence." However, in applying this test the crucial question is whether a reviewing court is only to consider the evidence which tends to support the agency's findings, or whether it is also to consider the evidence which controverts, explains, or impeaches the former. Use of the statutory words "in view of the entire record as submitted" strongly suggests that the test of reasonableness is to be applied to the evidence as a whole, not merely to that part which tends to support the agency's findings. This court so interpreted sec. 227.20 (1) (d), Stats., in *Albrent Freight & Storage Co. v. Public Service*

*Comm.* (1953), 263 Wis. 119, 128, 56 N. W. (2d) 846, 58 N. W. (2d) 410, and *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 45, 56 N. W. (2d) 548. See also 4 Davis, Administrative Law Treatise, pp. 129, 130, sec. 29.03.

It is a commonly accepted principle that a reviewing court should not pass on the credibility of witnesses nor the weight of the evidence, because these lie exclusively within the province of the agency. Likewise, a reviewing court is not to substitute its judgment for that of the agency where, in evaluating conflicting evidence in a field in which the agency possesses expertise which the court does not, the agency probably has employed its expert knowledge. However, in reviewing an agency finding, drawing a line between a weighing of the evidence and the evaluation of its reasonableness presents an illusive problem. We deem apropos the comment found in 4 Davis, Administrative Law Treatise, pp. 143, 144, sec. 29.06:

"But when should a court hold a finding reasonable which is based upon evidence which the court considers to be weaker than the evidence on the other side? Close examination of particular cases reveals that courts which are ordinarily trying to limit themselves to reasonableness inevitably to some extent determine questions of rightness, for the problem is in final analysis one for judicial judgment, and the formula for review becomes to some extent artificial. One is reminded of the sound observation of the court made in the *Universal Camera* opinion: 'A formula for judicial review of administrative action may afford grounds for certitude but cannot assure certainty of application. Some scope for judicial discretion in applying the formula can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata. The ultimate reliance for the fair operation of any standard is a judiciary of high competence and character and the constant play of an informed professional critique upon its work. . . . [T]he pre-

cise way in which courts interfere with agency findings cannot be imprisoned within any form of words . . . ' " *Universal Camera Corp. v. National L. R. Board* (1951), 340 U. S. 474, 488, 489, 71 Sup. Ct. 456, 465, 95 L. Ed. 456.

The division among the members of this court in the instant appeal illustrates the difficulty involved in application of the reasonableness test without crossing the line of weighing evidence.

### *Valuation of Goodwill.*

Keeping in mind the test of reasonableness and its proper application as heretofore discussed, we turn to the question of whether the trial court erred in setting aside the board's finding that each petitioner received assets of $175,000 upon liquidation of the old corporation. The value of the old corporation's tangible assets at time of liquidation is not in dispute. Taking this value as a verity, the board placed a value of $1,031,055.77 upon the old corporation's goodwill in order to arrive at a figure of $175,000 as the value of the assets each petitioner received upon liquidation. This $1,031,055.77 valuation of the goodwill is the exact figure at which goodwill was carried on the books of the new corporation. Therefore, the crucial question is whether this valuation of goodwill is supported by substantial evidence in view of the entire record. This in turn is dependent upon whether this valuation offends the test of reasonableness when all of the evidence is considered, and not merely that which tends to support the board's finding.

The tax court, in *Friedlaender v. Commissioner* (1956), 26 T. C. 1005, 1017, has declared that: "Essentially, the goodwill of a business is the potential of that business to realize earnings in excess of the amount which might be considered a normal return from the investment in the tangible assets." Another similar definition is that goodwill

"is that asset, intangible in form, which is an element responsible for profits in a business." *Jacob v. Miner* (1948), 67 Ariz. 109, 120, 191 Pac. (2d) 734.

Mertens states that: "The value of goodwill is ordinarily best demonstrated by the capitalization of earnings attributable thereto." 10 Mertens, Law of Federal Income Taxation (Zimet rev.), ch. 59—p. 79, sec. 59.30. There is one other acceptable method of establishing the value of goodwill. When tangible and intangible assets are subject of a sale, the value of the tangible assets is subtracted from the sale price and the difference establishes the value of the goodwill. Id. ch. 59—p. 91, sec. 59.37.

The attorney general's brief states that the $1,050,000, paid by the Thomson group for three quarters of the stock of the old corporation shortly before the liquidation, is "very persuasive fact to support the board's finding." On the basis of this sale price the value of the entire assets, after deducting liabilities, would be $1,400,000, and after deducting therefrom the conceded value of the tangible assets as of December 1, 1947, there would remain $1,031,055.77 as the value of the goodwill. Thus, reliance was placed upon the second of the two accepted methods of determining the value of the goodwill.

While it is true that courts frequently resort to the price paid in an "arm's-length" sale to determine the value of corporate stock, such evidence is only reliable where there is a ready market for the stock and a history of transactions therein. In the instant case, the sale was an isolated transaction in stock of a closed corporation. There were no other transactions in the stock, or evidence of transactions in the stock of other comparable companies, to either support or discredit the valuation set by the instant sale. Thus, the board should have carefully scrutinized the transaction before accepting it as indicative of fair market value.

Such a close scrutiny would have disclosed that the sale involved a transfer of control of the corporation. It is well

recognized that a "control increment" attaches to shares in a block constituting a majority of the shares outstanding, and that this control increment makes these shares more valuable than the minority shares. *Royal Trust Co. v. Equitable Life Assur. Society* (2d Cir. 1917), 247 Fed. 437, 441; Hill, The Sale of Controlling Shares, 70 Harvard Law Review (1957), 986; Revenue Ruling 59–60, C. B. 1959–1, 237, 242. There has been considerable litigation concerning the fiduciary duty of the majority to account to the corporation for the excess received for their shares due to the control increment. See *e.g., Perlman v. Feldmann* (2d Cir. 1955), 219 Fed. (2d) 173, 50 A. L. R. (2d) 1134; Anno. 50 A. L. R. (2d) 1146. Although this problem is not presented here, reference to it serves to emphasize the importance and value embodied in the control increment.

Because of the presence of the control increment in the instant sale, it clearly is unreasonable to assign the same per-share value to petitioners' minority shares as was paid by the Thomson group for their majority shares. When the $1,031,055.77 valuation of goodwill, computed with reference to the price paid by the Thomson group, is tested against any generally accepted accounting standard of calculating goodwill, it is established beyond any shadow of doubt that the Thomson group paid a large control increment in the acquisition.

The most generally accepted accounting standard for the calculation of goodwill is that based on earning capacity. This is known as the capitalization-of-earnings method, and it is computed as follows:

". . . the amount of earnings attributable to the goodwill is determined by (1) determining the average annual net earnings of the business, (2) determining the value of the tangible assets [*i.e.,* the net worth less any intangible assets], (3) deducting from the total net earnings the earnings attributable to the tangible property, and (4) capitalizing

the balance." 10 Mertens, *supra,* at ch. 59—p. 80, sec. 59.30, and cases cited therein.

Petitioners' expert witness, Certified Public Accountant Kimball, testified as to the results of applying this method to the instant facts. His analysis of the corporate records determined that the average annual earnings for the five years preceding the liquidation were $39,190.60, and for the three preceding years were $32,968.57; and that the five-year and three-year averages of the corporation's net worth, increased by the appraisal, were $314,793.74 and $338,131.03, respectively. He used these figures with expected rates of return of seven, eight, nine, and 10 percent on the net worth, and capitalized the excess earnings at 15 and 20 percent. The resulting goodwill valuation ranged from a maximum of $114,367 to a minimum of zero. Kimball summed up his direct testimony by stating that, in his judgment, the reasonable value of the goodwill should be obtained by using an expected rate of return of eight percent on the five-year average net physical assets (*i.e.,* net worth), deducting the result from the five-year average annual earnings, and capitalizing the excess earnings at 20 percent. This would produce a valuation of $70,035 for the goodwill.

The proper rates of expected return and capitalization to be used with the capitalization-of-earnings method, based upon court decisions, are discussed in 10 Mertens, *supra,* at ch. 59—p. 88, sec. 59.35. Of the rates mentioned in the cases cited by Mertens, the combination most favorable to the attorney general's position is that of expected earnings of eight percent on the net worth with the excess earnings capitalized at eight percent. Applying these rates to the five-year average figures here presented (the average most favorable to the attorney general's position) results in a goodwill valuation of $175,088.75. Mertens also states that: "The fact that earnings have been decreasing, and that the

value of the tangibles used in the business has been increasing, will affect the rates of capitalization permitted." Id. at ch. 59—p. 89, sec. 59.35.

The large difference between the valuations of goodwill based upon capitalization of excess earnings and the $1,031,055.77 valuation set by reference to the sale, clearly points out the unreasonableness of the board's determination to use the figure derived from the sale. Of course, in arriving at the proper value of goodwill by capitalizing earnings, the percentage rates to be utilized are for the board, and not this court, to determine. There undoubtedly are outside limits beyond which the board cannot go without transgressing the rule of reasonableness, but that is a field in which the courts ought to accord considerable deference to the expertise of the board.

It has been demonstrated that the board's instant valuation of goodwill cannot be grounded upon the sales price paid by the Thomson group in view of the fact that such valuation has no reasonable relationship to the capitalization of earnings. However, there remain some other items of evidence to be considered in the nature of admissions by petitioners. One of these is that petitioners filed federal income-tax returns for the year 1947 in which they reported a gain of approximately $330,000 from the liquidation ($350,000 minus the cost to taxpayers of slightly less than $20,000). Another is that Arthur Copland testified that when the new corporation was organized, "I presume that at that time I thought the net worth of the partnership was $1,400,000." A third is that, as two of the three incorporators of the new corporation, petitioners voted for a resolution which recited that in their judgment the property of the partnership, including franchises, was of a value at least equal to the $1,400,000 value of the capital stock and debentures demanded of the new corporation.

The efficacy of these admissions as evidence of the value of goodwill is greatly weakened by the fact that petitioners were minority stockholders and could not afford to jeopardize their interests as such by antagonizing the majority Thomson group. Petitioners had no practical alternative but to go along with the plan. Also, petitioners had no other basis on which to report the transaction for federal income-tax purposes than that employed in the plan. Perhaps it should be pointed out that a taxpayer is not estopped from taking one position with respect to a federal tax matter and an entirely different one when a matter of state taxation is at hand. Therefore, we are not here concerned with any issue of estoppel.

Furthermore, to ground a valuation of goodwill upon such admissions of an owner, or even upon expert testimony not grounded on capitalization of earnings or on a history of *bona fide* sales, when such evidence is present and shows a value at great variance therewith, is patently unreasonable. Thus, agency findings as to goodwill, not grounded upon a history of *bona fide* sales, which cannot be reconciled with a capitalization of earnings by an accepted formula, of necessity must be held unreasonable and subject to reversal upon judicial review.

Therefore, we are of the opinion that the trial court was correct in reversing the determination of the board and remanding the matter with directions to enter findings of fact consistent with the court's opinion.

*By the Court.*—Order affirmed.

BROWN, FAIRCHILD, and GORDON, JJ. (*dissenting*). We do not differ in any respect from the statement of the law under the heading "Scope of Review of Agency Finding" in the opinion of the court written by Mr. Justice CURRIE. Our

difference lies solely in the application to the evidence in the record before us.

In our view the record presents a conflict in evidence as to the value of each taxpayer's interest in the partnership, or ultimately the new corporation, after the reorganization. On the one hand the value found by the board of tax appeals is supported by the informed judgment of the so-called Thomson group and the taxpayers themselves, demonstrated by their acts and statements in 1947 and 1948. On the other hand, the generalized, and no doubt statistically valid, rules on which Mr. Kimball based his opinion would support a different finding. The latter, however, are not, in our view, conclusive. Putting it in the terms used in the majority opinion, these rules and Mr. Kimball's opinion derived therefrom do not render reliance upon the contemporaneous judgments of the parties unreasonable.

There is a measure of sympathy directed toward taxpayers because they held a minority interest. Perhaps they were reluctant, as suggested by the testimony of Mr. Thomson, to have the gain in value of their interest in the old corporation recognized for tax purposes in 1947. Such sympathy, however, should be wholly immaterial in determining from the evidence the value of their interest and resulting gain.

H. B. Thomson, apparently the leader of the group of six Thomsons, all related, who purchased a three-quarter interest in the old corporation in 1947, had been in the Coca-Cola business all his life. From 1923 to 1935 he had been general manager of Western Coca-Cola Bottling Company, the grantor of the franchise involved. He had operated and been interested in other Coca-Cola distributing companies. His group had just sold a Coca-Cola bottling company in Illinois. The Madison company served a larger population and in Thomson's opinion had eventually a greater possibility than the territory which they had sold. He and his associates

paid $1,050,000 for the three-quarter interest. It is true that this was a controlling interest although the largest individual holding was only about 31 percent and Mrs. Copland, one of the taxpayers here, was a sister of at least one member of the Thomson group.

Mr. and Mrs. Copland, the taxpayers, reported their gain on their United States income-tax returns for 1947, each indicating the value of the interest received as $175,000, the value found in this proceeding by the state board of tax appeals. Any overstatement of the value was indeed costly. Mr. Copland paid a federal income tax of $42,168.41, his other income being $5,544.33, and Mrs. Copland a tax of $41,497.17, her other income being $1,644.33. If the factor of control weakens the inference from the price paid for three quarters of the corporation that the value of the remaining quarter was $350,000, the fact that the taxpayers reported that value on their federal returns strongly supports it.

Besides these unequivocal contemporaneous acts relied upon by the board of tax appeals, there were statements made in the course of the corporate proceedings and participated in by taxpayers attesting the total value of the property involved. In addition a Mr. Festersen, a certified public accountant from Omaha, who specializes in Coca-Cola bottling-company work on a national basis, had prepared a statement for the new corporation as of December 1, 1947. His certificate that the balance sheet, which included valuation of the Coca-Cola franchise at $1,031,055.77, fairly reflected the financial condition of the corporation was contained in a letter to the board of directors which also stated: "On or about August 20, 1947, 75 percent of the stock of the Madison Coca-Cola Bottling Company was sold for a cash price of $1,050,000; thus establishing a value for the entire corporation of $1,400,000."

The taxpayers did not testify before the board that they had been mistaken in reporting the value of their interests

in the 1947 federal returns, nor did they suggest that they had unwillingly reported such values because of pressure from the Thomson group.

Mr. Copland, who had been the managing officer of the old corporation since 1929, testified as follows:

"*Q.* Didn't you think at that time [when the new corporation was organized] that the net worth of the partnership was worth that amount? $1,400,000? *A.* I presume so."

Mr. Thomson testified with reference to his purchase of the interest in the Madison company:

"When we sold that [Springfield] we took that money and bought Madison and we considered that more or less of an exchange, Madison having a larger population and eventually greater possibility than the territory we sold. *Q.* You considered Madison would have future possible value? *A.* On account of the greater population we considered it had been a good proposition. I had been in the Coca-Cola business all my life. I had seen it grow all through the years. Unfortunately we bought it at the peak and it has not developed since as we had anticipated. I will admit it was a bad purchase. I am mighty sorry I hadn't bought listed securities on the New York stock exchange."

Our review of the evidence satisfies us that the board's findings of value and gain were sufficiently supported and should have been sustained.