Paul MUELLER and Gabriel Wolff,
Plaintiffs-Appellants,

v.

Herbert F. KORHOLZ et al., Defendants-
Appellees.

No. 18053.

United States Court of Appeals,
Seventh Circuit.

Sept. 21, 1971.

A. Bradley Eben, Arthur T. Susman, Chicago, Ill., for plaintiff-appellant, Gabriel Wolff; Orlikoff, Prins, Flamm & Susman, Chicago, Ill., of counsel.

Robert O. Mansell, Chicago, Ill., Charles S. Rhyne, Courts Oulahan, Robert H. Culp, Rhyne & Rhyne, Washington, D. C., Quinn, Jacobs, Barry & Foster, Chicago, Ill., for defendants-appellees.

Before KILEY, FAIRCHILD and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff-appellant, a shareholder of Susquehanna Corporation, contends that the second and third steps of a three-step transaction produced a "short-swing" profit for defendant Korholz, a Susquehanna director, which is recoverable on behalf of Susquehanna pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Defendants contend that the second step was not a "sale" within the meaning of the Act and, in any event, there was no "profit realized by" Korholz from either the entire transaction or just the last two steps.

After a full trial, the district court made extensive findings of fact sustaining these defenses. In our opinion the findings that Korholz realized no profit are well supported by the record and, therefore, we do not reach the issues raised by the first defense. Nevertheless, a description of the entire transaction is essential to an understanding of the case.

## I.

The three steps took place on May 25, July 2, and December 13, 1965.

A. On May 25, 1965, Korholz acquired 430,000 shares of Susquehanna common stock at a price of $15 per share. Before making this acquisition Korholz had reached at least an informal understanding with four other interested parties.

1. The sellers (referred to as the "Lannan Group") advised Korholz early in May that their Susquehanna stock was available for purchase at a price of $15 per share, payable in cash, provided that the transaction could be closed promptly. Since they were to be paid in cash, the Lannan Group was apparently willing to sell either to Korholz individually or to American Gypsum Company (Gypsum). Korholz was a director of Gypsum and with his family owned 56% of its stock.

2. The First National Bank of Boston ("the Bank") agreed to lend $6,500,000 to Gypsum to finance the purchase provided that it could be assured of a first lien upon Gypsum's assets as well as a pledge of the Susquehanna shares to be purchased. The condition could not be satisfied by Gypsum without the consent of two insurance companies from which it had borrowed substantial funds in March. After the insurance companies indicated their willingness to consent on certain conditions, and after Korholz and Gypsum indicated that the conditions could be met, the Bank agreed to make an interim loan to Korholz individually, which would be replaced within 30 days by a loan to Gypsum. Before any funds were disbursed

in consideration of the note signed by Korholz personally, the Bank had received the substitute note and other documents executed by Gypsum, as well as telegraphic confirmation of the insurance companies' informal consent.

3. The two insurance companies agreed to consent to the bank loan secured by a first lien on Gypsum's assets on three conditions:

(a) that Gypsum would agree to repay the bank loan upon a merger of Gypsum into Susquehanna;

(b) that the proceeds of any sale of Gypsum's Albuquerque plant be used to reduce the bank loan; and

(c) that Korholz and two other Gypsum directors be elected to Susquehanna's board.

In telegrams sent to Gypsum on May 12 and May 14, the insurance companies evidenced their consents subject to these specific conditions.

4. The Gypsum board of directors decided at a meeting on May 12, 1965, to acquire the Susquehanna shares for the price specified by the Lannan Group; to make the bank loan; and to accept the conditions requested by the insurance companies. Since the Bank was unwilling to advance funds to Gypsum until after its loan agreements with the insurance companies had been formally amended to evidence their consents, and since the Lannan offer would expire before the amendments could be drafted, approved and executed, the Gypsum board adopted a resolution providing that if Korholz acquired the stock individually, and if the consents were obtained within one month, Gypsum would acquire the stock from Korholz at his exact cost.[1]

The resolution specified that Gypsum would be under no obligation to Korholz if the consents were not received within one month.

As contemplated by the May 12 resolution of the Gypsum board, and by the informal understandings with the Bank and the insurance companies, Korholz

---

1. The directors' resolution read, in part:

"WHEREAS, it is the consensus of this Board that it would be in the best interest of this company to acquire the aforesaid shares of Susquehanna at said price and but for the necessity of obtaining the consent of insurance companies to which this company is indebted to waive restrictions under certain note agreements, this Board would adopt a resolution authorizing the purchase of said shares of Susquehanna at that price; and

"WHEREAS, it is the desire of this Board to place the company in a position to acquire said shares contingent upon the consent of said insurance companies; and

"WHEREAS, Herbert F. Korholz and Martha Korholz have indicated their willingness to attempt to acquire said shares as their own property at a price of $15.00 per share, and to bind themselves to sell said shares, if acquired, to the company at that price if and when impediments to acquisition by the company are removed, and this company has indicated to Herbert F. Korholz and Martha Korholz that it will acquire from them said shares for a price equal to the price paid by them, together with costs and expenses * * * incident to said acquisition, if the insurance companies * * * agree to the modification of the Indenture Agreements enabling this company to acquire said shares;

"NOW, THEREFORE, BE IT RESOLVED: That if Herbert F. Korholz and Martha Korholz acquire 430,000 shares of Susquehanna at $15.00 per share and if consents are first had and received from the insurance companies to which this company is indebted under certain loan indentures permitting acquisition of said shares, the company will acquire from Herbert F. Korholz and Martha Korholz said approximately 430,-000 shares of the common stock of The Susquehanna Corporation at $15.00 per share, together with reimbursement to Herbert F. Korholz and Martha Korholz of any costs and expenses (including any interest expense incurred by them) incident to said acquisition; provided that such consents are received within one month from the date of this resolution. If such consents are not received, the company shall be under no obligation to Herbert F. Korholz and Martha Korholz in connection with their acquisition of said shares. If Herbert F. Korholz and Martha Korholz do not acquire said shares, they shall be under no obligation to the company in connection thereunder."

purchased the Susquehanna shares on May 25, 1965. The transaction was closed through an escrow. As noted, before the funds were disbursed the escrow deposits were made not only by the sellers and Korholz, but also by Gypsum which had executed an undated note and other documents contemplating a transfer of the transaction to it as soon as the documentation was concluded. The purchased Susquehanna shares were issued in the name of a nominee and held by the Bank, originally as security for Korholz's note and later for Gypsum's.

If the scriveners had completed their work before June 12, 1965, the conditions specified in the directors' resolution would have been performed to the letter and this litigation would never have arisen.

B. On July 2, 1965, Gypsum acquired the 430,000 shares of Susquehanna stock from Korholz for $6,499,028.96, equivalent to a price of $15.114 per share. The amount was equal to the price paid to the Lannan Group, plus interest on the interim loan and other costs attributable to the transaction.

The formal amendments to the agreements with the insurance companies were executed "as of" June 9, 1965, but their execution and delivery was not actually completed until after June 12, 1965. The legal consequences of the failure to meet the deadline are the subject of extensive factual and legal argument, but for purposes of our decision we make the somewhat theoretical assumption that between June 12 and July 2 Korholz had the legal right to act as sole owner of the Susquehanna stock.

On this assumption, he sold it to Gypsum on July 2, 1965.

C. On December 13, 1965, Gypsum was merged into Susquehanna. For each 1.9 shares of Gypsum stock, Korholz and his wife, like all other Gypsum shareholders, received one Susquehanna share. In exchange for their block of Gypsum, they acquired over 430,000 shares of Susquehanna.[2] Thus, less than six months after his "sale" of Susquehanna to Gypsum on July 2, 1965, Korholz made a "purchase" of a larger block by reason of the merger.

The experts who were employed to recommend an exchange ratio made an appraisal of the value of each company's shares in August, 1965. The 1.9 to 1 exchange ratio reflected appraised values of $10.75 and $5.65 per share of Susquehanna and Gypsum, respectively. On the basis of these appraised values, plaintiff contended that Korholz had paid a price of $10.75 per share for the Susquehanna stock acquired by the merger. He thus allegedly realized a profit of $4.364 per share, representing the difference between $10.75 and the price of $15.114 received on July 2, 1965.[3]

Alternatively, on appeal plaintiff makes two additional arguments. First, noting that over-the-counter quotations immediately prior to the merger were about $13.00 for Susquehanna and about $7.00 for Gypsum, he contends that current market values established a profit of $2.00 per share. Second, he contends that the burden of disproving a profit should have been placed on Korholz as a fiduciary who had breached his trust to

2. Korholz received 386,102; Mrs. Korholz received 140,171.

3. Plaintiff omits mention of the fact that appraisal values determined for reorganization purposes are not market values. Susquehanna's $10.75 per share value was the so-called "break up" value determined by valuing all of Susquehanna's assets and dividing the total by the number of outstanding shares. On the other hand, the $5.65 per share value of Gypsum was the "going concern" value based upon the experts' analysis of earnings, appropriate capitalization rate and other factors. These figures were not intended to represent the market price in August, 1965, or at any other time. As far as market value is concerned, the figure could at best be characterized as the experts' view on what the market price *should* be. It *would* be such only if all investors shared the experts' interpretation of each of the many divergent factors affecting market value.

Susquehanna shareholders by engaging in a "short-swing" transaction.

The district court found that Korholz had made no profit. Instead of concentrating attention on the value of the Susquehanna shares received by Korholz as a result of the merger, the court focused on the value of the consideration which Korholz exchanged for that stock. That consideration, he found, was a control block of Gypsum stock which had a value greater than the market value of individual Gypsum shares. Based on expert testimony offered by defendants, the court found that the value of the consideration surrendered by Korholz on December 13, 1965, was in excess of $15.11 for each share of Susquehanna stock received. On the basis of these findings of fact, Korholz derived no profit from the transaction.

## II.

We first consider plaintiff's final argument relating to burden of proof. The short answer to this argument is that defendant did assume the burden of proving that he paid more for the Susquehanna shares that he acquired in December than he had received for those he sold in July. The district court found that this evidence was reliable and sufficient and sustained that burden.

In addition, we note that plaintiff's entire case is predicated on acceptance of a truncated version of the transaction as including only steps two and three. If we view the transaction as a whole, it is plain that Korholz gained nothing but the benefits of the merger itself. As originally intended, and as ultimately consummated, his participation in steps one and two was entirely for the benefit of Gypsum and its stockholders.[4] There

is not the slightest evidence of overreaching or lack of good faith. In contrast to the facts disclosed in typical cases imposing a severe burden of justification on a faithless fiduciary,[5] if liability attaches here, it will result not from the character of the business behavior, but solely from counsel's failure to structure the transaction in a somewhat different form or to conclude necessary documentation more promptly. Nevertheless we accept plaintiff's truncated version of the transaction for purposes of our decision.

## III.

The price of $15.114 per share received by Korholz on July 2, 1965, was a derived price, computed by dividing the aggregate amount of his reimbursement ($6,499,028.96) by the number of shares in the block (430,000). The "price" which Korholz paid for the block of Susquehanna shares received on December 13, 1965, is necessarily also a derived price, which must be computed by dividing the value of the consideration which he surrendered by the number of Susquehanna shares he received. See Stella v. Graham-Paige Motors Corp., 259 F.2d 476, 479 (2nd Cir. 1958), cert. denied, 359 U.S. 914, 79 S.Ct. 583, 3 L.Ed.2d 576; Blau v. Mission Corp., 212 F.2d 77, 81 (2nd Cir. 1954), cert. denied, 347 U. S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138. Contrary to plaintiff's argument, the value of the Susquehanna shares which Korholz received, whether measured by the appraisals in August or by the market value in December, is not of controlling importance.

As consideration for the Susquehanna shares acquired on December 13, Korholz parted with a block of Gypsum stock which represented control of that company. Two well qualified experts[6]

4. Indeed, the predicate for plaintiff's entire statutory case is a denial of a continuing fiduciary relationship between June 12 and July 2, 1965.

5. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Shlensky

v. South Parkway Building Corp., 19 Ill.2d 268, 280–281, 166 N.E.2d 793, 800–801 (1960).

6. Robert A. Podesta, President, The Chicago Corporation, and Robert M. Leopold, a Vice President of New York Hanseatic Corporation.

testified that such a block has a greater value per share than individual shares. The trial court credited this testimony and we do not understand plaintiff to dispute this basic proposition. *Cf.*, Essex Universal Corp. v. Yates, 305 F.2d 572, 576 (2nd Cir. 1962); Royal Trust Co. v. Equitable Life Assur. Society, 247 F. 437, 441 (2nd Cir. 1917). However, plaintiff does attack the experts' calculation of the premium value of Korholz's Gypsum stock.

The trial court found that the average price of Gypsum stock in the over-the-counter market on December 13, 1965, was $6.875 per share. It then found that shares in a control block had an additional, or premium, value of 20%. Using that premium value ($8.25), the exchange ratio of 1.9 to 1 resulted in a derived price of $15.675 for the Susquehanna shares acquired by Korholz on December 13. Since this price was higher than the derived price of $15.114 received in July, Korholz realized no profit.

Plaintiff attacks the premise that $6.875 represented the value of Gypsum stock on December 13, and also the finding that Korholz's control block was worth a premium of 20%. We think both findings are supported by the evidence.

On December 13 there was no actual trade of Gypsum stock. Quotations in the over-the-counter market ranged on the "bid" side from 6¾ to 6, and on the "asked" side from 7¼ to 7⅛.[7] The court, using a point above the high bid and below the lowest asking price, concluded that the value was 6⅞.[8] The expert testimony describing the over-the-counter market in Gypsum itself over a period of time clearly supports this finding as a reasonable interpretation of the facts.

Plaintiff makes three objections to the finding that Gypsum shares were worth $6.875 on December 13. First he contends as a matter of law that the low bid price of $6.00 was the only acceptable evidence of value because the policy of § 16(b) requires the court to adopt an interpretation of the facts that will "squeeze out all possible profit." *Cf.*, Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2nd Cir. 1943).

The comment in that case may guide a court's choice between two reasonable interpretations of the facts. It does not require a court to adopt a completely unrealistic interpretation of the market. In this case the evidence shows that the owners of Gypsum were unwilling to sell for less than $7.125 a share and prospective purchasers were willing to pay $6.75. Clearly a finding that the market value was only $6.00 would be unsupportable.

Second, plaintiff contends that nothing short of an actual trade can evidence market value on a given day. The testimony of the experts was to the contrary, and we agree with the district court that it was credible. There is ample precedent for this view. See Jaffe v. Cruttenden, 412 Ill. 606, 615–616, 107 N.E.2d 715, 721 (1952); Allender Co., 9 S.E.C. 1043, 1057–58 (1941); Charles Hughes & Co., 13 S.E.C. 676, 678–79 (1943).

Third, plaintiff correctly points out that the market quotations are for 100 share lots and do not establish the value of a block of several hundred thousand shares. Such a quantity of stock offered for sale on the open market might well drive the price down precipitously.

7. One of the exhibits shows an asking price of only 6½, but this was a report which had been received in the mail and reflected the market at an earlier time; both expert witnesses agreed that that figure should be disregarded.

8. Decimally, the median price would have been approximately $6.93, but expert witness Leopold apparently rounded off to a fraction and estimated the value at 6⅞. Expert Podesta testified to a value of 6.93 which he rounded to 6.90. The trial judge, by using the 6⅞ figure, stated decimally as $6.875, thus took the figure most favorable to plaintiff.

But no such "dumping" took place or was contemplated. The experts made no attempt to estimate the price that would be realized in such a hypothetical situation. They merely used the market quotations as one element in their calculation of the value of Korholz's stock. Their opinion that his holdings had a greater value than smaller lots was supported not only by their expert judgment but also by the fact that he received a premium offer not long before the merger.[9] We think the evidence amply supports the finding of $6.875 as an "average price" or value of Gypsum stock on December 13, 1965.

■ Plaintiff also attacks the finding that Korholz's shares had a premium value of 20%. First, he argues that a premium may only be recognized in the context of a negotiated transaction, and that Korholz's position as a fiduciary foreclosed him from seeking more favorable benefits from the merger than other Gypsum stockholders.[10] The argument loses sight of the fact that the valuation issue turns not on the value of what Korholz might receive, but rather on the value of what he delivered. Whether he did or could negotiate a favorable bargain is beside the point. Our only concern is with the value of the Gypsum block which he surrendered. The finding that those shares had a premium value is well supported by the record.

Second, plaintiff contends that the amount of 20% is excessive. One expert estimated the premium at 25%; the other in the range of 20% to 30%. The court accepted the more conservative estimate.

Plaintiff argues that this estimate was less probative than the evidence showing the actual premium which Korholz paid when he made the original purchase from the Lannan Group on May 25, 1965. The cash price of $15.00 represented a premium of only about 10.7%[11] over the price of Susquehanna on that day.

There are a number of answers to this argument. The May transaction involved a different company (Susquehanna, not Gypsum), a relatively smaller block of stock, and took place at a different time. The price was set by the Lannans at a level which would make the prompt consummation of an all-cash transaction possible. The reaction of Korholz and the Gypsum board of directors, as well as the insurance companies and the Bank all tend to suggest that it was a bargain purchase from the buyer's point of view. Finally, as the above discussion demonstrates, the argument is advanced in a factual context in which the district court's appraisal of the entire record is entitled to special deference.

■ We are satisfied that the district court correctly concluded that Korholz realized no short-swing profit.

## V.

There is one final contention to consider. After the trial was concluded, and based on the district court's finding that Korholz was a fiduciary for Gypsum with respect to the 430,000 shares of Susquehanna acquired on May 25, 1965, plaintiff filed a motion to amend the judgment to require Korholz to convey 25,000 additional shares to Gypsum.

9. The price offered Korholz was $8.00, somewhat lower than the value found by the court (which is consistent with Korholz's refusal of the offer), but still higher, on a 1.9 ratio, than the July 2, 1965, price of $15.114.

10. Of course, his fiduciary position would not prevent him from receiving *less* favorable benefits by giving up something of greater value than that surrendered by other Gypsum shareholders. Thus, plaintiff's argument does not meet the facts as found by the trial court.

11. The premium could be computed as high as 12% or as low as 9.6%, depending on the combination of ask and bid prices used.

The original discussions with the Lannan Group had contemplated a purchase of 455,000 shares. However, in May one member of the group, Wheelock Whitney, was out of the country. For that reason his 25,000 shares could not be included in the May 25 purchase.[12] Accordingly, Korholz and an associate gave Whitney an option, exercisable by August 21, to sell his 25,000 shares at the $15.00 price. Whitney exercised the option and Korholz bought the stock.

 Originally plaintiff argued that this purchase gave rise to § 16(b) liability. He has since abandoned that claim and, after judgment, argues that Korholz as a Gypsum director appropriated a Gypsum corporate opportunity. Assuming that plaintiff, as a Susquehanna shareholder, has standing to attack a pre-merger transaction affecting Gypsum, which is at best doubtful, and disregarding the inconsistency between this contention and plaintiff's denial of Korholz's fiduciary capacity between June 12 and July 2, 1965, we think it is plain that the attempt to raise an entirely new series of issues, both factual and legal, after judgment comes too late.[13] The trial court properly denied the motion to amend the judgment.

The judgment is affirmed.

12. And also for that reason, the May 12 resolution of Gypsum's directors referred to only 430,000 shares and not 455,000.

13. Cleary v. Indiana Beach, Inc., 275 F.2d 543, 546–547 (7th Cir. 1960), cert. denied, 364 U.S. 825, 81 S.Ct. 62, 5 L.Ed.2d 53 (1960); Macris v. Sociedad, 245 F.2d 708, 710–711 (2d Cir. 1957), cert. denied, 355 U.S. 922, 78 S.Ct. 364, 2 L.Ed. 2d 353 (1958). The Supreme Court in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), acknowledged that "the grant or denial of an opportunity to amend is within the discretion of the District Court," 371 U.S. at 182, 83 S.Ct. at 230 and there required that there be a "justifying reason appearing for the denial." *Id.* Here the judge's order denying the motion is supported by "justifying reasons." He concluded the amendments "would not cause the pleadings on the judgment to conform to the evidence either as presented at trial or as formulated in the findings of fact," and that the amendments rested on a "theory never presented at trial." Indeed, the theory was directly inconsistent with plaintiff's theory of the case at trial and raised entirely new issues on which no evidence had been adduced, such as whether the Whitney transaction was a corporate opportunity in the first place and, if so, whether Korholz could defend on the grounds that the corporation had rejected the "opportunity" as to the Whitney shares.