**ALLIS–CHALMERS MANUFACTURING COMPANY, a Delaware corporation, Plaintiff,**

**v.**

**GULF & WESTERN INDUSTRIES, INC., a Delaware corporation, Defendant.**

**Nos. 70 C 513, 69 C 627.**

United States District Court, N. D. Illinois, E. D.

Jan. 30, 1974.

Revised March 4, 1974.

S. Hazard Gillespie, William H. Levit, Jr., and Sheila T. McMeen, Davis Polk & Wardwell, New York City, H. Blair White, Sidley & Austin, Chicago, Ill., Maxwell H. Herriott, and W. Stuart Parsons, Quarles, Herriott, Clemons, Teschner & Noelke, Milwaukee, Wis., for plaintiff.

John A. Guzzetta, Bernhardt K. Wruble, Conrad K. Harper and Lindsay A. Lovejoy, Jr., Simpson, Thacher & Bartlett, New York City, Wesley G. Hall, and Lary Blust, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

This action was commenced on January 6, 1969 in the United States District Court for the Eastern District of Wisconsin by plaintiff, Allis-Chalmers Manufacturing Company, now Allis-Chalmers Corporation (hereinafter referred to as "Allis"). Plaintiff seeks to recover alleged short-swing profits from Gulf & Western Industries, Inc. (hereinafter referred to as "G&W") under Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b)) alleged by plaintiff to have been realized by G&W as a result of two purchases in July and September of 1968 aggregating 3,248,000 shares of Allis common stock and the subsequent sale of these shares on December 6, 1968.

Pursuant to a motion by G&W under 28 U.S.C. § 1406(a) that venue was improper in the Eastern District of Wisconsin the case was transferred to this District. Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc., 309 F. Supp. 75 (E.D.Wis.1970). At the same time G&W commenced an action in this Court for declaratory judgment. Gulf & Western Industries, Inc. v. Allis-Chalmers Manufacturing Company (69 C 627). On March 23, 1970 the two actions were consolidated and this Court ordered the consolidated action to proceed on the basis of Allis' Amended Complaint which was originally filed on February 19, 1970 in the Eastern District of Wisconsin.

Allis, a corporation organized under the laws of the State of Delaware, having its principal office in West Allis, Wisconsin, is a manufacturing company engaged in the manufacture of agricultural, construction, industrial and electrical machinery and related equipment.

G&W, a corporation organized under the laws of Delaware, having its principal office in the City and State of New York, is a diversified company engaged in a variety of businesses, including manufacturing, distribution, leisure time operations and the production of minerals, metals and certain agricultural and consumer products.

During the period June 30, 1968 and December 31, 1968 there were between 10,364,102 and 10,410,292 shares of Allis common stock issued and outstanding. 3,000,000 of these shares were purchased by G&W through an Exchange Offer made to all Allis shareholders, and 248,000 shares of them were bought from the Oppenheimer Fund, Inc.

On May 7, 1968 G&W publicly announced to all Allis shareholders that it would make an Exchange Offer in accordance with a registration statement and prospectus filed and published as required by the Securities Act of 1933. G&W proposed to purchase on a pro-rata basis up to 3,000,000 such shares. Under the proposed offer Allis shareholders would receive for each share of Allis common stock: (a) $11.50 in cash, (b) $12.50 principal amount of a 6% subordinated 20-year nonconvertible debenture ("the G&W 6% Debenture"), and (c) 9/10 of a 10-year registered warrant to purchase G&W common stock at $55 per share ("the G&W Warrant").

There is a major dispute as to the date on which the purchase of the 3,000,000 shares of Allis common stock occurred. G&W contends that the date was July 29, 1968; Allis contends the date was July 31, 1968. Both parties agree that G&W's purchase of the additional 248,000 shares of Allis' common from the Oppenheimer Fund took place later on September 30, 1968. In exchange for these 248,000 shares G&W gave Oppenheimer 496,000 unregistered G&W warrants.

On December 6, 1968 G&W sold its entire block of 3,248,000 shares of Allis' common stock to White Consolidated Industries, Inc. (hereinafter referred to as "White") in exchange for: (a) 250,000 unregistered shares of White common stock, (b) White's unsecured 8½% promissory note in the face amount of $93,680,000 payable in six months, and (c) $20,000,000 in cash.

Allis now seeks to recover what it alleges are short-swing profits of $16,305,251 which it contends G&W realized from its two purchases in July and September 1968 and its subsequent sale in December of 1968 of the 3,248,000 shares of Allis common stock. The total sales price is alleged to have been $121,330,000. Allis' position is that the purchases and the sale both occurred within less than six months. Allis claims that the amount of the sale together with the dividends received by G&W during this less than six month period, minus its stipulated cost of acquiring and selling the 3,248,000 shares constitute the amount of profit. Allis also seeks to recover interest at 6% on G&W's profits from the date of sale, December 6, 1968, to the date of entry of judgment.

G&W's Answer to the Amended Complaint denies all material allegations of the Complaint, and specifically alleges, inter alia, that G&W was not a beneficial owner of more than 10% of Allis' stock at the time of its acquiring through the Exchange Offer the 3,000,000 Allis shares, and that this is required by Section 16(b). G&W contends that since its acquisition of the 3,000,000 Allis shares was pursuant to an Exchange Offer regulated by the Securities Act of 1933 the transaction would be excluded from the purpose of Section 16(b). G&W further charges that the sale of its 3,248,000 Allis shares was induced by "duress and hostility" to G&W, originating with Allis and inflamed through Allis' encouragement of Federal Trade Commission proceedings against G&W. G&W thus denies liability. But then, going further, G&W claims that even if there is liability, it realized no profit from the transactions and there would be no money due to Allis as a result of this action.

## LIABILITY

The jurisdiction of this Court is asserted under Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. 78aa).

Section 16(b) of the Act states as follows:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no

such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

Section 16(b), thus, provides that liability attaches to 10% beneficial owners who are such: " . . . both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . ."

■ G&W contends in one of its affirmative defenses that as to the 3,000,000 shares of plaintiff's common stock acquired by G&W pursuant to the Exchange Offer, G&W is not liable to Allis for any profits that may have been realized upon the sale to White since at that point in time when G&W acquired the 3,000,000 shares G&W was not a beneficial owner of more than 10% of Allis' equity security within the terms of the statute. This would mean that it then *became* the owner of more than 10%, and only a subsequent acquisition would bring the statute into play.

Allis, however, contends that on an *initial* purchase of more than 10% one becomes such a holder of more than 10%

of the stock of a company as to trigger the applicability of Section 16(b). To bolster its contention that one becomes subject to Section 16(b) at the time of the purchase which turns one into a 10% beneficial owner irrespective of the percentage of his prior holdings, if any, Allis quotes from the recent decision in Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 584, 93 S. Ct. 1736, 1739, 36 L.Ed.2d 503 (1973):

"Unquestionably, one or more statutory purchases occurs when one company, seeking to gain control of another, acquires more than 10% of the stock of the latter through a tender offer made to its shareholders."

In the *Kern County* case defendant, Occidental Petroleum Corporation, made a tender offer for shares of the Kern County Land Company (hereinafter referred to as "Old Kern"). That offer became effective on May 8, 1967 and by May 10 more than 10% of the shares had been tendered. The Court found that Occidental became a beneficial owner within the terms of 16(b) when pursuant to its tender offer it purchased more than 10% of the outstanding shares of Old Kern.

G&W relies upon *Kern County* also. This is because in that case a tender offer was involved, which like the exchange offer here, raised the question of whether or not the nature of the purchase was reached by the statutory definition.[1]

1. Pertinent language in the decision includes the following from 593–595, 93 S.Ct. 1744: "Although traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six month statutory period are clearly encompassed within the purview of § 16(b), the courts have wrestled with the question of inclusion or exclusion of certain 'unorthodox' transactions. The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase. In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transactions may serve as a vehicle for the evil which Congress sought

to prevent—the realization of short-swing profits based upon access to inside information—thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits. The statute requires the inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within the specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information. Under these strict terms, the prevailing view is to apply the statute only when its application would serve its goals. '[W]here alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the con-

A careful analysis of the case law including *Kern County* leads me to the conclusion that G&W by its initial purchase, became a beneficial owner of more than 10% of Allis' stock. In construing the words "at the time" as used in the statute the Court in Stella v. Graham-Paige Motors Corp., 104 F. Supp. 957, at 960 (S.D.N.Y.1952), aff'd in part, remanded in part, 232 F.2d 299 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956) said as follows:

> ". . . if the words 'at the time' are construed to mean 'simultaneously with', a shareholder would become subject to the provisions of § 16(b) as soon as his ownership exceeded 10% of the outstanding shares. This construction would be consistent with the declared purpose of the statute to prevent the unfair use of inside information by officers, directors, or stockholders owning more than 10% of the equity stock."

Through the years since the *Stella* decision the Courts have followed its thinking in construing the words "at the time of the purchase and sale" to apply to shareholders immediately upon their acquisition of more than 10% of a corporation's securities. In Bershad v. McDonough, 300 F.Supp. 1051 (N.D.Ill. 1969) aff'd, 428 F.2d 693 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S. Ct. 458, 27 L.Ed.2d 440 (1971), as in *Kern County, supra*, the Court was concerned with whether the granting of an option was a sale (the back end of the transaction) within the confines of Section 16(b). However, it is clear that the Courts would not have concerned themselves with that issue had they first not reasoned that Section 16(b) liability turned on an initial acquisition exceeding 10% serving to set in motion the 6

month period. In accord with these cases are the holdings in Emerson Electric Co. v. Reliance Electric Co., 434 F.2d 918 (8th Cir. 1970), aff'd on other grounds, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972); Blau v. Lamb, 363 F.2d 507 (1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (2 Cir. 1967); and Newmark v. RKO General, Inc., 425 F.2d 348 (2 Cir. 1970), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L. Ed.2d 91 (1970).

■ On the facts before me, I conclude that G&W became a beneficial owner of more than 10% of Allis' common stock at the time of its purchase, by tender offer, of the 3,000,000 shares of Allis' stock. However, G&W argues that even if it became a 10% owner of Allis' common stock at the time it acquired by tender offer almost a third of Allis' equitable ownership and sold the whole of it within six months, it is exempt from the operation of Section 16(b) because the purchase was "unorthodox" and "unorthodox" transactions do not involve the type of abuse Section 16(b) was enacted to prevent.

G&W presents a strong argument for the proposition that its initial acquisition of the Allis shares by an Exchange Offer was not the traditional cash-for-stock purchase that Congress considered in passing Section 16(b). Rather, G&W contends, it was a hybrid type of transaction with unique characteristics closely resembling a merger. G&W says that it would be erroneous to consider the legal consequences of G&W's acquisition of the stock apart from the disclosure process with which it alleges "it was inextricably connected." The argument is that Exchange Offers (as distinct from cash transactions) are surrounded by numerous legal safeguards which are designed to guarantee full disclosure to

gressional purpose of curbing short-swing speculation by corporate insiders.' Reliance Electric Co. v. Emerson Electric Co., [*supra* 404 U.S. at 424, 92 S.Ct. 596]. See Blau v. Lamb, 363 F.2d 507 (CA2 1966), cert. denied, 385 U.S. 1002, [87 S. Ct. 707, 17 L.Ed.2d 542] (1967). Thus '[i]n, interpreting the terms "purchase" and "sale," courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse.' "

all shareholders and thus by their very nature are unsuited to short-swing speculation based on inside information.

In effect, the argument is that since the acquisition was conducted in accordance with the methods established by the Securities and Exchange Commission and Congress, i. e., pursuant to a registered Exchange Offer and by a Prospectus, G&W was not automatically an insider nor was there any possibility of abuse as a result of the nature of the transaction. Its offer, G&W contends, was subject to the prohibition against the use of any Prospectus (or Registration Statement) which contained "any untrue statement of fact or omission of a material fact required to be stated * * * or necessary to make the statements therein not misleading." Such prohibition appears in a number of sections of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, 77q, 77x. Accordingly, G&W maintains, it caused all material information regarding Allis to be released to the public and placed in the hands of each Allis shareholder and that these actions afforded all parties to the proposed exchange an equal informational footing, eliminating thereby any advantage to G&W.

In opposition to this contention Allis ignores certain words of *Kern County*, "unorthodox sale—not a sale within the meaning of 16(b)", and argues that an unfettered reading of the language of Section 16(b) makes it clear that the statute does not require any showing that an insider had inside information in order for liability to attach. The suggestion that full and truthful disclosure of what is known is required by some other necessary proceedings, according to Allis, creates no defense to the charge that there was an actionable purchase.

It is true that the court in *Kern County* found that an unsuccessful takeover bidder who converted shares of the target company into the merged entity's shares was not liable for short-swing profits when it was found that there had been no opportunity for speculative abuse. The target corporation, Old Kern, had vigorously opposed Occidental's takeover bid and to thwart such a takeover had arranged a "defensive merger" with Tenneco. Due to the merger of Old Kern and Tenneco, Occidental was virtually forced to exchange the Old Kern shares that it had acquired by its tender offer for those of Tenneco. The successor corporation to Old Kern brought suit to recover the alleged Section 16(b) profits realized by Occidental. The court concluded that the transaction having been forced upon Occidental did not constitute a "sale" within the purview of Section 16(b). The court noted that the merger left Occidental with no appraisal rights under California laws; but that any other sale of Old Kern shares for cash before the merger closed "would have left Occidental with a prima facie § 16(b) liability." *Supra* 411 U.S. at 600, 93 S.Ct. at 1747, 36 L. Ed.2d 503.

I am convinced that with these words the Supreme Court recognized that where, for example, a purchase carries sufficient indicia of full disclosure of all information available to the purchaser, and its sale is an economically or legally coerced involuntary act the transaction is not intended by Congress to be unlawful; but that when the sale is clearly voluntary a prima facie Section 16(b) violation would exist. When we on the trial bench try to facilitate our determination by limiting liability to simple categories, such as "orthodox" and "unorthodox", we may easily blind ourselves to the kinds of abuses to which Congress directed 16(b). The 1934 Senate Report on Stock Exchange Practices (Senate Comm. on Banking and Currency), Stock Exchange Practices, S.Rep. No. 1455, 73rd Congress, 73 Cong. 2d Sess. 55 (1934) stated:

"Among the most vicious practices unearthed at the hearings before this subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations * * *. Closely allied to this type of abuse was the unscrupulous employ-

ment of inside information by large stockholders who, while not directors or officers, exercise sufficient control over the destines of their companies to enable them to acquire and profit by information not available to others."

Even though *Kern County* is a clear repudiation of the "cold turkey" application of statutory liability in 16(b) cases, nowhere in *Kern County* does the Supreme Court take out of 16(b) its application to a short-swing transaction just because there was in fact no access to inside information. It leaves the statute applicable to types of transactions that give "rise to speculative abuse". (*Kern County* at 595, 93 S.Ct. 1736). Under *Kern County* (594 f.n. 26, 93 S.Ct. 1736) the language of this Circuit in Bershad v. McDonough, 428 F.2d 693 (7th Cir. 1970), was confirmed. Then it went one step further. It announced a flexible "possibility of abuse" test to be applied to each case on the facts regarding its questioned transaction. The specific transaction itself must permit the possibility of or potential for abuse. *(Kern County,* 411 U.S. at 595, 93 S.Ct. 1736).

The question is whether or not an outsider becoming a prima facie insider, such as defendant, by virtue of a tender offer to purchase one third of plaintiff's common stock, under the circumstances of this case, engages in that type of transaction which Congress determined gives rise to the possibility of or potential for speculative abuses. By virtue of the nature and amount of the purchase, such purchaser generally places himself or itself in a position to at least exercise

substantial influence over the decisions of the corporation, if not control. From this position information can be acquired not otherwise available to the public. Stock value changes can be reliably anticipated if not maneuvered. The desirable speculative character of a free market can be wrecked by the cumulative effect of a substantial amount of such piracy. The danger, of course, in each instance, is not easily established by evidence of actual manipulation or intent to manipulate.

Some corporations have as their primary occupation dealing in the stock of other corporations. Some buy and sell units of corporate control for profit. It seems to me that irrespective of whether the purchase under these circumstances is handled in an "orthodox" or an "unorthodox" manner, it can constitute one of the types of conduct which Section 16(b) was intended to reach.

This does not mean that Congress sought by this law to stop or even dissuade corporations from using their equity for moving in and out of positions of control or effective influence in other corporations, either for the purpose of investment or the purpose of acquiring on a trial and error basis absorbable corporate operations. The statute does intend to include corporate conduct out of which buying and selling for profit from an insider's perspective can occur. The evidence in the case before me shows defendant, G&W, as having engaged in a substantial number of transactions involving the purchase and sale of controlling interests in other corporations.[2] There is nothing in the evidence to establish that G&W's acqui-

---

2. Its chief executive officer, when asked to confirm or reject a statement appearing in the February 15, 1973 edition of the Wall Street Journal, stated that he "would not reject the statement." The statement was that, from 1958 through 1968:

   " * * * G&W acquired about 130 companies, usually using its own securities or packages of its securities and warrants to buy the companies. At first the acquisitions were complementary with G&W's main lines of business, but later it

branched out in all directions. The big year was 1968 when 23 acquisitions came under G&W's wing. * * * G&W that year similarly withdrew from stock positions in other large companies—Armour and Co., Allis-Chalmers Manfg. Co., and Sinclair Oil Corp. In fact over the years, G&W has bought in and out of companies both for investment reasons and for the purpose of acquisition and complete control."

sitions and dispositions were for the purpose of gaining inside information to be used selling stock positions in corporations for profit, or that it actually did have inside information when it bought or sold. I am confident that the greater weight of the evidence presented to me does not establish that G&W had inside information of the character contemplated by Section 16(b) either before or after its purchase of Allis. But I am convinced that its position both at the time of the purchase and at the time of the sale was such as would, in many such situations, permit access to information not otherwise available to the general public.

Allis failed to establish that G&W did have inside information both at the time of the purchase and at the time of the sale. What was shown was that in May of 1968 G&W's president was told by the head of a California investment firm that he had encouraged an investment firm to seek a merger with Allis; that Allis had been interested in being a part of a profitable merger; that the investment company and Allis had entered into a preliminary agreement to merge, but that the plan fell through because the investment firm believed a heavy manufacturing business inherently risky. This cannot be considered the type of inside information to which the statute refers. In addition, what was shown was that in September of 1968, before G&W sold its Allis stock, Allis' president told G&W's president that Allis' performance during that quarter of the year was extremely poor and that its earnings had declined sharply, but the inference to be drawn from this was that Allis sought to discourage G&W's retention of its stock position in Allis. Other information given G&W by Allis was almost contemporaneously made public.

■ G&W asserted as an affirmative defense the *absence* of inside information; but here again I find the facts insufficient. A fact does not exist here which is found in other cases in which this affirmative defense has succeeded.

The missing fact is that plaintiff's conduct locked the defendant outside so effectively that the defendant could not have acquired inside information had it wanted to. This is what happened in *Kern County,* and in Gold v. Sloan, 486 F.2d 340 (4th Cir. 1973).

■ I further find the facts insufficient to establish as an affirmative defense that G&W was *compelled* to sell its stock in Allis before the expiration of the statutory period. Occidental was not only locked out in *Kern County,* but under the circumstances was left no realistic alternative to disposing of its stock in Old Kern. Its only alternative would have left it with a prima facie 16(b) liability. Of the same order was the circumstance which compelled Scurlock in Gold v. Sloan to acquire the Susquehanna stock, part of which he sold within six months. G&W was here not *caught* in a merger. The one clear-cut defensive tactic of Allis, slashing its quarterly dividend in half after G&W had acquired one third of its common stock, as offensive as G&W may have felt it, was nevertheless not an act which compelled a sale some fifty odd days before the end of the statutory period.

## VALUATION

Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78p(b)), provides that "for the purpose of preventing the unfair use of [inside] information," the beneficial owner shall pay over to the complaining corporation any profit realized by the purchase and sale. What then is the amount, if any, Allis is entitled to be paid by G&W is the remaining question. Allis contends that the amount is $16,305,251, with additional interest to the date of the entry of judgment. G&W contends that there was no profit, but rather a loss, and that Allis would be entitled to nothing.

The issue of the amount of profits to be accounted for where there is a 16(b) liability calls into play, when the consideration given or received is other than cash, certain principles of valuation.

Were the consideration given and received cash only, the problem would be a simple one; but in most of these cases it usually is not just cash. Most of the cases under 16(b) cited by the parties in their briefs, in which liability had been found, involved consideration other than cash.

In this case the purchases were made with some cash, but principally with G&W warrants and debentures; and the sale was made for some cash, but principally for certain unregistered shares of common stock of White, and an unsecured six month corporate promissory note. Valuations of these other-than-cash considerations was the matter to which both sides were requested to and did direct much of their attention in testimony, exhibits and argument. The testimony and opinions of expert witnesses was presented at great length by both sides. Were the position of the plaintiff and its experts accepted completely, the defendant would be accountable for $12,741,788 in profits, for dividends and for interest from the date of the sale to the date of this decision. Were the position of the defendant and its experts accepted completely, it would be found that the defendant, through no fault of its own, lost $11,545,566 (if not $13,699,993) in the purchase and sale. The differences of more than 30 million dollars between the positions of the parties and their experts must be resolved by applying to the facts basic principles of valuation derived from authorities in the field of securities and accounting, and from cases interpreting valuations in 16(b) cases.

The Court itself must determine the fair market value or the fair value (in the absence of a market) of the consideration given up and received in a 16(b) case. Real or actual values, as in other cases, may require investigation of the affairs of the corporations and businesses involved; but the situs of the 16(b) valuation is the actual or presumed market place. Park & Tilford, Inc. v. Schulte, 160 F.2d 984, 990 (2nd Cir.) cert. denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947).

■ Where in determining valuation two or more interpretations may equally be drawn from the same facts, the Court may adopt the one least favorable or most favorable to the defendant as the relative equities of the parties dictate; but in doing so the Court is not required to adopt a completely unrealistic interpretation of the market. Mueller v. Korholz, 449 F.2d 82, 87 (7th Cir. 1971). One of the major disagreements between the parties in this case is the plaintiff's insistence that in 16(b) cases, valuations always must be read in the light least favorable to the defendant or most favorable to the plaintiff.

■ The concept of maximizing profit by using such theories as "lowest in and highest out" as espoused in the 1943 decision of the 2nd Circuit in Smolowe v. Delendo Corporation, 136 F.2d 231, 239, is not the law in this (7th) Circuit. In *Muller, supra*, 449 F.2d at 87, we are admonished not to adopt a completely unrealistic interpretation in the name of advancing the Congressional purpose. In that case the Seventh Circuit was confronted with the problem of valuing the defendant Korholz's holdings of "Gypsum" stock traded in the over-the-counter market. No evidence was presented of actual trades on the date in question, but there was evidence of dealers "making a market" in Gypsum stock. Their quotations ranged from 6 to $6\frac{3}{4}$ on the "bid" side and from $7\frac{1}{4}$ to $7\frac{1}{8}$ on the "asked" side. This meant that the best bid Korholz could have received from his shares was $6\frac{3}{4}$. As the Seventh Circuit explained, the plaintiff contended:

" * * * as a matter of law that the low bid price of $6.00 was the only acceptable evidence of value because the policy of § 16(b) requires the Court to adopt an interpretation of facts that will 'squeeze out all possible profit.' Cf. Smolowe v. Delendo Corp., 136 F.2d 231 (2 Cir. 1943)."

Then explaining away the language of the Second Circuit, the court in *Mueller* went on to say at 87:

"The comment in that case [Smolowe; *supra*] may guide a court's choice between two reasonable interpretations of the facts. *It does not require a court to adopt a completely unrealistic interpretation of the market.*" (Emphasis added.)

The court thereafter proceeded to affirm a valuation based not on $6.00 the low bid, nor even on the $6.75 best bid, but on a $6.875 "average price or value" on the relevant date.

There are numerous cases in which courts have chosen either the high or low figure for what appeared to be punitive purposes. Blau v. Lamb, 242 F. Supp. 151 (S.D.N.Y.1965), rev'd and aff'd in part, 363 F.2d 507 (2 Cir. 1966), cert. denied 385 U.S. 1002, 87 S. Ct. 707, 17 L.Ed.2d 542 (1967); Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y.1965); Gratz v. Claughton, 187 F.2d 46 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L. Ed. 1353 (1951); Heli-Coil Corp. v. Webster, 222 F.Supp. 831 (D.N.J.1963), aff'd as modified, 352 F.2d 156 (3d Cir. 1965); Blau v. Lehman, 173 F.Supp. 590 (S.D.N.Y.1959), aff'd 286 F.2d 786 (2 Cir. 1960), aff'd, 368 U.S. 403, 82 S. Ct. 451, 7 L.Ed.2d 403 (1962). But it appears to me that in those cases the trial courts must have been without evidence from which realistic values might have been computed. As a result of evidentiary default, and faced with a decisional necessity, they resolved the issue through "stop-gap" application of Congressional purpose. *Mueller's* understanding of *Smolowe* would apply also to them. Even so, *Mueller's* admonition to the trier of fact to seek from the evidence, if at all possible, a basis upon which a realistic interpretation of fair market value can be made, is to me a highly responsible mandate.

## THE PURCHASE

During the six month period involved in this case there were between 10,363,102 and 10,410,292 shares of Allis' common stock issued and outstanding. G&W opened it by buying, 3,000,000 shares through an exchange offer and later acquired directly from the Oppenheimer Fund, Inc., an additional 248,000 shares. Before the end of the period G&W sold all 3,248,000 to a single purchaser, White Consolidated Industries, Inc.

The parties disagree as to the date upon which G&W acquired the 3,000,000 shares, not because it was the day that began the six month countdown, but because of the substantial difference in value of the stock on the different dates asserted by the parties to be the date of purchase. The exchange offer was publicly noticed through the press by G&W on May 7, 1968. There is no evidence as to whether or not there was any awareness of G&W's intentions prior to that date. The offer was to purchase from all Allis shareholders on a pro-rata basis up to 3,000,000 shares, offering in exchange for each share: $11.50 in cash; $\frac{9}{10}$ of a warrant to expire January 31, 1978 to acquire a share of G&W common at $55; and a $12.50 principal amount of a 6% G&W Subordinate Debenture to be due July 1, 1988. According to the proxy statement the exchange offer was conditioned on approval of G&W shareholders on July 29, 1968. If this approval were forthcoming, G&W would accept all Allis shares tendered up to 3,000,000. If more than 3,000,000 would have been tendered by July 19, 1968, all would be accepted on a pro-rata basis. If fewer than 3,000,000 would have been tendered by July 19, G&W would accept all shares tendered after that date in their order of receipt up to 3,000,000 shares. All tenders were irrevocable.

Before July 29, 1968, more than 3,000,000 Allis shares had been tendered, and on that date G&W's shareholders approved the Exchange Offer. Thereafter, in the "Initial Statement of Beneficial Ownership of Securities" required by Section 16(a) of the Securities Exchange Act of 1934 to be filed with the

SEC, it was stated that G&W acquired 3,000,000 shares of Allis' common on July 31, 1968. In G&W's monthly report to the SEC for the month of July, 1968, it was stated that "Registrant, on July 31, 1968, acquired 3,000,000 shares of common stock of Allis-Chalmers." In a document called "Welcome to Gulf & Western" sent out to the new G&W warrant holders under the exchange offer, it was stated that "The effective date of the Exchange was July 31, 1968." G&W's warrant agent dated all warrants given in exchange for Allis common, on the date July 31, 1968, and an answer by G&W to one of Allis' interrogations filed in these proceedings contained sufficient reference to July 31, 1968, to generate a contention by Allis that G&W judicially admitted July 31st to be the acquisition date; but the certainty of that answer as an admission is clouded by the nature of the answer and the context within which it was given.

Using July 29, 1968 as the valuation date itself, G&W comes out with a gross purchase price per Allis share of $37.93. Using July 31 as a controlling date, Allis comes out with a gross purchase price per Allis share of $35.37. This difference, crudely stated, of $2.56 per share, places the parties initially seven million dollars apart in their computations.

Allis contends that the court is bound by the manner in which G&W handled the exchange offer in its accounting, public and judicial records, and statements. Allis contends that as far as possible the court must resolve issues in favor of the plaintiff, because 16(b) is "remedial". Thus Allis, by holding G&W to the July 31st date, a day on which the stock market was closed, acquires August 1st as the valuation date, a day which, over July 29th, substantially maximizes profit. On August 1st nothing happened between the parties. On July 29th G&W itself became irrevocably bound to Allis' shareholders who in reliance on the terms of the exchange offer had irrevocably tendered their stock for securities that in turn had a remote equitable interest in Allis. To use estoppel here to argue against a contractually relied upon date as the day for valuation that will "squeeze out" all possible profit is almost to manufacture profit and to render the statute punitive and not remedial.

■■ As indicated above, in 16(b) determinations, the manner in which a corporation handles its financial records and statements for its own or public purposes, and its statements in courts may, like admissions against interest, weigh heavily against such corporation, but the court may not use these facts to abandon its duty of determining the market value. Estoppel will not intervene to bind a party to what otherwise under the facts would be an erroneous determination of artificial profit. Mueller v. Korholz, *supra*; Park & Tilford, Inc. v. Schulte, *supra*; Champion v. Jeffress, 352 F.Supp. 1081, 1084 (E.D.Mich.1973).

■ Earlier in this case, when it was before the District Court for the Eastern District of Wisconsin (the case was later transferred to this district), Judge Reynolds of that court announced that the date of purchase is that on which the "insider" becomes bound and by the act of shareholder approval entitled to acquire the tendered shares. Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc., 309 F.Supp. 75, 80–81 (E.D. Wis.1970). I conclude with him, from all the evidence that July 29, 1968 was for purposes of valuation the date of purchase.

■ Plaintiff contends that the value of 9/10ths of a G&W warrant expiring in 1978 to acquire a share of G&W's common stock at $55 must be merely 9/10ths of the low at which those warrants were traded on the exchange on the valuation date. When we use the date Allis chose—August 1, 1968—and that day's low—13.875, we come out with a figure of $37,462,500.[3] When we

3. 9/10ths of 13.875 × 3,000,000; or 9/10ths of 3,000,000 (2,700,000) × 13.875.

use the date of the rule of this case—July 29, 1968—and that day's low of 15.0, we come out with a figure of $40,500,000.[4] I disagree with both. If an investor is to be ordered to turn over his "profit", without proof of wrongdoing, it should be real and not manufactured profit. The research and reporting services relied upon by the public in the market recite lows and highs to reflect trends, but when reflecting an isolated day in a single figure they use an average. A quick average is half the sum of the high and low. A refined average would be the volume-weighted average for the day. We should use neither the high nor the low if we have the facts from which to make a realistic determination. Mueller v. Korholz, *supra*; Volk v. Zlotoff, 318 F.Supp. 864, 866 (S.D.N.Y.1970).

Defendant contends that as to its warrants, we at least should consider their volume-weighted average on July 29th. This average was 15.56301. When we use that average we come out with the figure of $42,020,127.[5] With this I agree. But then, the defendant goes further and urges that a realistic valuation of the warrants would recognize the effect of arbitrage upon the value of the warrants. This, according to G&W, would require using the weighted-average in the trading of the warrants over the period of May 7, 1968, when public notice was given of the intent to follow through on the exchange offer, and July 29, 1968, the acquisition date. This average was 18.93. Were that average used, we would come out with the figure of $51,120,000; the amount G&W claims to be the proper valuation. With this I do not agree.[6] I

---

4. $9/10$ths of 15.0 x 3,000,000; or $9/10$ths of 3,000,000 (2,700,000) x 15.0.

5. $9/10$ths of 15.56301 x 3,000,000; or $9/10$ths of 3,000,000 (2,700,000) x 15.56301. Defendant rounded this figure for the average at 15.-56, and came out with the lesser amount of 42,012,000.

6. I learn from the witnesses that quite commonly during exchange and tendered offers specialized trading comes into play and affects the market price of one or the other of the securities involved, from the time of a market awareness of a proposed exchange or tender offer until the consummation of the transaction.

Generally the proponent of the exchange, the seller, in order to insure the success of his proposal, places in the package he offers as consideration things that would add up to a higher market value than that of the securities sought. This, I am taught by the witnesses, attracts arbitrageurs whose dealing in these securities causes their market prices to be unrepresentative of what they would be even when they reflect the offer. Fair market value thus should reflect an averaging out of the difference between the down pressure of arbitrage activity and the resistance of the security to that pressure.

The defendant strongly urges that statistics show that arbitrage did occur here and that the value of the warrants should take it into account. But the reports of Investment Statistics Laboratory show no changes in the trading and prices of the warrants, at least during the first two months of the exchange offer which could not be attributed to the offer itself. Were arbitrage applicable in this case, it seems to me that to strike an average over the entire period of awareness of the offer when no serious drop in the prices of the warrants occurred until a few weeks before the acquisition date, would give excessive weight to the high as against the low. This indeed would be manufacturing a valuation.

On the other hand, the evidence shows that without any dramatic increase in warrants outstanding from April through July, there was a dramatic increase in short interest over the period of the exchange. The percentage of short interest to outstanding warrants increased from .4 in April to 13.4 in May, and then to 14.7 in June and 18.9 in July. In August it returned to 8.0, in September to 4.5 and in October and November back to .4. When this fact is placed along side the daily trading and closings of the warrants over the same period of time, it becomes clear that there was arbitrage relating to this exchange offer. But it becomes equally clear that it had no effect upon the market of the warrants until on or after July 12th on which day they traded dramatically low and closed at 19.25. Prior to then its closings described no pattern. During the 42 market days from May 7 to July 12, the movements were not unusual. There was a lowest closing at 17.25 on June 28th, and a highest closing at 20.75 on July 8th. But after the 19.25 closing of July 12th there was a meaningful, consistent decline to an all time low of 13.875 on August

am of the opinion that to apply arbitrage would be unrealistic and artificial.

In 16(b) valuations of the consideration given through exchange offers in payment for the stock of the plaintiff corporations, making adjustments of market value to reflect the impact of arbitrage activity upon securities of one side would deprive the parties of fundamental fairness. G&W would have a windfall of at least $4,981,500.

I find no case law to guide me on this issue, but when I analyse carefully the testimony of the expert witnesses I conclude that in any case in which the purchase is effected through a security for security exchange offer, adjusting the market value of the securities given as consideration for the target securities to reflect the impact upon the market of arbitrage would be improper. To allow G&W an additional cost amount reflecting arbitrage, would be to give G&W compensation for having made the exchange offer.

The effect of the exchange offer itself on the market price, as from day to day while it is open and information and rumors about it change, is as substantial an unknown as is arbitrage. Both are that speculative in nature that when the proponent of an exchange offer, as here, puts together his package of considerations to pay for the target security, as he is deemed to have placed it in what will insure the success of the exchange, so he must be deemed to have withheld from it what he calculates will be necessary to cover for the aberrations of the market, including arbitrage. Were he, hypothetically, buying up his own package at the time of the exchange, and in the market place, and were he allowed an adjustment for arbitrage, he would

benefit from it twice. Just as the court will not construct a valuation to manufacture a higher profit, so it will not permit considerations which, though perfectly fair and proper in other valuations, have the effect of manufacturing an undeserved deduction from profit.

In view of the foregoing, I conclude that the value to be assessed the warrants given as part consideration for the 3,000,000 Allis common shares on July 29, 1968, is $42,020,127.

■ The third item of the consideration given for each of the 3,000,000 shares of Allis' common stock was a $12.50 principle amount of a G&W 6% subordinated debenture.[7] The debentures were issued in denominations of $100 and for each Allis share one eighth of a debenture was given. There thus were 375,000 of such debentures issued and all were given in the 3,000,000 share exchange. They were new debentures due in 1988. On the date of purchase controlling in this case, July 29, 1968, none of these debentures were traded on the stock exchange. As far as that is concerned, even the August 1st date claimed by Allis to be the proper date of purchase would not serve to give a fair market value to them because there were too few traded upon which a fair valuation could be based. On July 29th there were outstanding and being traded in substantial amounts similar debentures due in 1987. On that day $87,000 of them were traded with an average between the high and low of 80.875.

The new debentures were first admitted to trading on the New York Stock Exchange on August 8, 1968. On that day, 332 one thousand dollar units were traded. They opened at 75, closed at 75,

1st. It is this decline which would reliably reflect the effect of arbitrage activity.

Were I to give a fair value to the impact of arbitrage upon the market price of the warrants on the date of purchase, I would strike an average between the closing on July 12, 1968, as explained above, and the weighted-average of the trading on July 29, 1968. With that in mind, I would find the fair market valuation of the G&W warrants

given as part of the consideration for the Allis common at the time of the purchase to be $46,993,500. (Half the sum of 19.25 and 15.56 is 17.405. 9/10ths of 17.405 x 3,000,000 (or 17.405 x 9/10ths of 3,000,000) (2,700,000) comes out to be $46,993,500.)

7. The first item was $11.50 cash per share. 3,000,000 x $11.50 = $34,500,000.

had a high of 76, a low of 74, and a volume-weighted average of 75.15023. Both Allis and G&W refer to August 8th for a meaningful valuation. Allis claims the amount should be the low of $74 because, it asserts, "Section 16(b) case law prescribes that the lowest price of a security on the date of purchase governs." G&W claims that the amount should be the volume-weighted average of the August 8th trading, $75.15 each. None of the experts were able to place a hypothetical or real valuation on the debentures, either as of July 29th or August 1st, based upon knowledge existing as of that day.

To choose the low of August 8th's trading, as requested by Allis, just to "squeeze out all possible profits", is to manufacture valuation. Since similar debentures were trading with a high-low average of 80.875, and since our debentures themselves finished out the rest of August with an average closing of 76.47, the volume-weighted average of the first trading day, August 8th, $75.15 is quite realistic of what would have been the fair market value on July 29th, had there been a market. Accordingly, I find the value of the debentures given up in the exchange offer to be $28,181,336 ($75.15023 x 375,000).

▋ In addition to the 3,000,000 shares of Allis' common acquired by G&W through the Exchange Offer, G&W later purchased 248,000 shares from Oppenheimer Fund, Inc. Their agreement of August 28, 1968, provided that in exchange for the Allis stock Oppenheimer Fund, Inc. would receive 496,000 G&W warrants. Because the consummation of this agreement depended upon, among other things, the listing of the G&W warrants and underlying common stock to their respective stock exchanges (subject to official notification of the issuance), the agreement called for a closing date three days after such listing but not later than September 30, 1968; and G&W would receive all dividends paid on the Allis shares after the agreement date, August 28th.

Although the G&W warrants would be listed without SEC registration and thus were not freely tradable, G&W agreed to file a registration on or before April 30, 1969. G&W also agreed that if the registration statement did not become effective by December 31, 1968, and if Oppenheimer chose to sell any warrant in the ninety days following the effective date of registration, G&W would guarantee or pay Oppenheimer an average gross price of $13.50 for each warrant Oppenheimer sold. The agreement was closed on September 30th. G&W did not cause the registration statement for the warrants to become effective until January 13, 1969, thus bringing into effect the agreement's price guarantee. On March 18, 1969, Oppenheimer informed G&W of its sale of 8,500 warrants and its plan to sell the remaining warrants beginning after March 21, 1969. The parties however ever reached an agreement wherein Oppenheimer would defer the immediate sale of the warrants, and G&W would extend the guarantee until October of 1969. On April 18 Oppenheimer invoked the extended guarantee and a week later made its demand upon G&W for $2,154,450. G&W paid it on June 5, 1969.

The parties have agreed that the valuation date of these 496,000 warrants was September 30, 1968. The agreement is realistic and I approve it. These warrants were unregistered at the time of purchase and their valuation must reflect that fact. On that date registered warrants were traded on a volume-weighted average at $16.11444. The experts were of the opinion that the discount should be between 9.5% and 18%. One figured the discount to be 9.5%. Another's opinion was 15%. Still another chose generally between 13% and 18%. The 15% was based upon the average of the trading in the warrants on September 30. I find it thus the most realistic discount. This would make the fair value of these warrants, there being no market, $13.69.

Placed upon this discounted price must be a value representing the guar-

antee to register within 3 months. If the warrants were not registered, as agreed, Oppenheimer could sell at what it could get, and in addition charge back against G&W the guarantee premium up to $13.50 per share. Since the guarantee was a penalty obligation, it seems to me that the guarantee of $13.50 and the discount of $13.69 would cancel each other, and leave the valuation to be attributed to the cost to G&W at the market price of September 30, 1968, less the difference between the discount and the guarantee, i. e., less 19¢. I therefore place on this purchase a price of $7,896,320 ($15.92 x 496,000).

From the foregoing, I find that the total purchase price paid by G&W for its purchase of the Allis common acquired through the exchange offer to be $104,701,463 and the purchase price of the total of the 3,248,000 exchange offer and Oppenheimer shares to be $112,597,783.

## THE SALE

When G&W on December 6, 1968, sold all 3,248,000 of its Allis common to White Consolidated Industries, Inc., it took in exchange $20,000,000 in cash, White's Promissory Note in the amount of $93,680,000, and 250,000 shares of White's common stock.

■ Between the parties there is no dispute about the $20,000,000, and little disagreement over the valuation to be given for the 250,000 shares of unregistered White Common Stock. Unlike the unregistered G&W warrants which figured in the contract between G&W and Oppenheimer, wherein a guarantee served to offset the discount, in the receipt by G&W of 250,000 shares of White's unregistered common as part of the sale price of the Allis common stock it had acquired, there was no price guarantee. One of the experts placed the discount at 15.3%, another at from 25% to 30%, and a third at 25%. The first of such expert's testimony was an "Offer of Proof" permitted in evidence, but because of his absence on the witness stand he was not confronted by cross-ex-

amination. I agree with the parties that the expert testimony setting the discount at 25% is well documented and convincing. Where the parties differ is whether the discount should be applied to the high of White's common selling on December 6, 1968, or to the volume-weighted average of the stock traded that day. For reasons I have already given and consistent therewith I find that the base figure should be that of the volume-weighted average. On that day there were 111 transactions involving 31,100 shares. The high was 42.50; the low was 39.25. The stock opened at 39.375 and closed at 42.00. The volume-weighted average was 40.6053. I find the fair value to be attributed to the White unregistered common was $7,613,493 ($40.6053 discounted by 25% x 250,000 shares).

■ The valuation on which the parties differ most dramatically is that to be assigned the largest consideration given G&W by White in its purchase of the 3,248,000 shares of Allis common, White's unsecured, six-month, 8½% promissory note in the amount of $93,680,000. The note must be valued as of the date it was given, December 6, 1968. The note was paid on March 20, 1969, but on December 6th it was impossible to know whether or not it actually would be paid on or before its due date. 16(b) valuations cannot be determined by hindsight. There are those who say that hindsight can test the accuracy of the earlier determination; but I find this test evidentially incompetent. At most it is a consolation for the one who turned out to have been right, but it can't prove that he was. It is evidence of the nature of the risk inherent in the foresight which is competent to establish the accuracy of the valuation. Of the same non-evidential worthlessness is the fact that after December 6th, G&W twice tried to sell the note and was advised that it could not sell it at anything near par. G&W had accepted the note on December 6th at face value.

Allis further contended that G&W is estopped from claiming any value other

than the face amount of $93,680,000 of the note, because of the manner in which in its own and public records it had handled the note. On December 6th, G&W placed the note on its record books kept for internal control at its face amount, in its communications with its stockholders reported the note in its face amount, and did the same thing in its filings with the SEC.

Allis further argues that as a matter of law the intent of the parties to the note as expressed in their contract, which recited the note at its face value, controls valuation as it shall be determined by this Court. As authority for this position Allis cites *Kern County*, supra, Bershad v. McDonough, 428 F.2d 693, 698 (7th Cir. 1970), and Newmark v. RKO General, Inc., 425 F.2d 348, 357 n. 9 (2nd Cir. 1970); and states that such an approach is entirely consistent with the statutory purpose of squeezing all of the profit out of a short-swing purchase and sale that violates 16(b).

I find that none of the cases cited by Allis in aid of its position on this matter supports it. I already have found that, though a party's handling of valuations in its private and public representations may serve as admissions against interest, estoppel will not serve to relieve the court of its duty to determine a realistic market value.

G&W argues that the note was "commercial paper" as differing from "investment paper", the former marketable only at a discount. It is apparent that because the short life and the size of the note on the one hand, and the nature of its promissor and the size of its interest (two points above the prime bank rate at the time), the note was of a hybrid nature that kept it from fitting comfortably into either of these categories. It seems to me that the disinterested but available third party investor would consider the note as worth something less than face value but certainly not as conventionally discountable "commercial paper". It seems to me, considering a comprehensive evaluation of the opinions of the experts who testified about it, he would, in purchasing it, lower it by some broker-like or cost for placement coefficient of risk below its face value. I am convinced that such adjustment would be closer to half the lowest suggested 10% discount attributed to it as commercial paper.

I was particularly impressed with the testimony of two experts, one a Kenneth V. Zweiner, and the other a Lewis Glucksman. Mr. Zweiner considered the note as "money good", and as a banker, had he been approached on December 6th, would have participated with other banks in purchasing the note at face value. Mr. Glucksman, head of the corporate bond department of Lehman Brothers which had handled commercial paper in excess of 40 billion dollars during last year, had at the time in question advised G&W that the note was "non financible" and that it would have to be factored at 10% to 15% less than its face amount. During this time Glucksman had personally reviewed White's financial condition and found it "unhealthy".

Mr. Zweiner considered that White had a substantial cash throw off in excess of forty million; that White had a good current ratio (excess of current assets over current liabilities) although it had a heavy debt structure; and that White had a good equity base behind it. Mr. Glucksman considered the note as an "unusual" one and too big for Lehman Bros. There had been telephonic commitments of banks to share in picking up the note (prior to December 6th) up to 50 millions of its face, but these commitments were qualified in that additional banks would have to be retained to handle the balance. The lending market at that particular time was tight; but that meant even the more that institutional type investors furnished an available market for long term interest-bearing secure investments. The excellent testimony of all of the many expert witnesses concerning this note considered comprehensively as stated above, causes me to find the market value of the note on December 6, 1968 to have

been 5% off its face value, i. e., $88,996,000.

It follows from all the above that the market value of the total consideration G&W received in exchange for its 3,248,000 shares of Allis' common stock it sold on December 6, 1968 to White Consolidated Industries, Inc. is $116,609,493.

## COSTS, DIVIDENDS AND INTEREST

Certain collateral matters must be considered which bear upon the question of the amount of profit which the defendant, G&W must turn over to the plaintiff, Allis: (1) allowable costs incurred in connection with the acquisition and disposition of the 3,248,000 shares of Allis' common stock within the statutory period; (2) the dividends paid by Allis while its stock was being held by G&W; and (3) interest on the profit.

As to the first of these items, the parties have stipulated that G&W's expenses incurred in connection with its exchange offer were $2,874,175.67, and in connection with its acquisition of the 248,000 shares acquired from Oppenheimer were $1,696.33. No evidence was presented regarding these matters other than the stipulation of the parties. In light of all the evidence, I find no reason to question these amounts of expenses presented me by the agreement of the parties. The total of expenses incurred then is $2,875,872.

As plaintiff admits, case law supports the proposition that the expenses of a defendant in performing a purchase or sale are a deduction from profit in 16(b) cases. Blau v. Mission Corp., 212 F.2d 77, 81 (2nd Cir. 1954); Arkansas Louisiana Gas Co. v. W. R. Stephens Invest. Co., 141 F.Supp. 841, 845, 847 (W.D.Ark.1956).

The second of these matters arises from Allis' claim that there should be included in G&W's profit the $406,000 dividends which Allis paid on the 3,248,000 shares of common stock while they were in the hands of G&W during the statutory period. Plaintiff relies for this contention on Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 744 (8th Cir. 1965), cert. denied 382 U.S. 987, 86 S.Ct. 556, 15 L. Ed.2d 475, and assumes support for its position in several other cases. I find it difficult to distinguish our case from *Western Auto* on the facts in order that its rule of law not be dealt with. In neither case was the purpose of the short-swing purchase and sale the making of a special profit from the dividends. If it has a legal message to be followed it is that there is no question about the fact that dividends should be available to the court to be used in situations where the conduct of the defendant was reprehensible—where the acquisition of substantial stock in a company was for the purpose of maneuvering the payment of large dividends—where the dividend itself was the target of stock manipulation.

Courts often have permitted the recovery of dividends when it could be inferred that there was some intended connection between the dividends and the short-swing transaction. Blau v. Lamb, 363 F.2d 507, 528 (2nd Cir. 1966); Adler v. Klawans, 267 F.2d 840, 848 (2nd Cir. 1959); Marquette Cement v. Andreas, 239 F.Supp. 962, 968 (S.D. N.Y.1965). But any use of *Western Auto* to go beyond this approach is to take a backward step from those cases. I find *Western Auto* now to be of dubious precedential vitality. Its holding was reached without any apparent analysis of any special role which dividends played in the case; and gracefully it was retreated from by the same court three years later in Petteys v. Butler, 367 F.2d 528, 535 (8th Cir. 1966), cert. denied 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967).

Experts in the field look upon anticipated dividends as part of the package for which the consideration is paid when the stock is purchased. In addition, dividends are not an element of profit in the sense that they do not result from the purchase and sale of stock, but rather come from the holding of stock. See

45 Va.L.Rev. 1057, 1060 (1959). In the language of the statute dividends logically are not profit. The statute reaches *"profit realized from the purchase and sale"*. Dividends thus are treated by the statute like an operational earning or income. This statutory interpretation reads upon the ordinary thinking about dividends in the market place. Except where they are a matter of special concern, the market price generally is presumed to cover dividends reasonably anticipated. At least to the extent that they regularly are paid, they are considered absorbed in the price paid for the stock.

To permit recovery by Allis of the 12½ cent quarterly dividend involved here would be unconscionable for a further reason. The evidence shows that Allis, in its fighting back at G&W's attempt to gain control of it, on August 9, 1968, nine days after the exchange offer was confirmed, slashed its regular and historic 25¢ quarterly dividend in half. The prospectus on the exchange offer, in reciting the dividend history of Allis, mentioned that in each of the first two quarters of 1968 a cash dividend of 25¢ per share had been declared. Moody's Dividend Record showed a continuous dividend record of 25¢ per quarter from and including the fourth quarter of 1966. It is retributive for Allis to say to G&W, "When we found that you had succeeded in acquiring one third of our stock through your exchange offer, before you could exercise a voice in our control we slashed our dividend in half. This should discourage you from any further attempts to divest us of our management controlled independence. But when you sold short of the statutory six months and made available to us the use of Section 16(b) to squeeze out of you every penny's profit, you gave us the right to get back as a part of 'profit' even the half dividend we paid you." For the Court to join Allis in this retributive approach would be for the Court itself to offend traditional notions of fair play and substantial justice.

Of the same vein must be this Court's response to plaintiff's demand for interest on the amount of the profit from the date of the sale to the time of this decision. If interest is added it certainly should not continue to the time of decision. This causes the total amount of interest to be measured by periods of time not within the control of the parties. These would vary from court to court, reflecting the different programs of courts in the management of the flow of cases through them. Not even should attorneys feel responsible for increases or reductions of potential awards to their clients because of the necessity for the flow of cases also to reflect necessary adjustments of time to accommodate reasonable uncertainties in professional availability. Litigants themselves should not be discouraged from participating fully in statutorily granted causes of action, either as plaintiffs or defendants, by knowledge that the size of awards will be materially affected by the professional affairs of lawyers and courts.

I am of the further opinion that the concept of interest in 16(b) cases offends logic. Since interest represents "the wages of money (or money measured values) at work", it ought be treated as such. If one wrongfully is deprived of the use of money in which one has a proprietary right, the wrongdoer should return it together with the wages it reasonably could have earned throughout the period its owner could have put it to work. The purchaser of stock of a corporation, issued and outstanding, is not taking from the corporation itself values which the corporation could itself have put to work. It is conceivable that the diving in and out by a short-swing profiteer can injure the corporation. I find no support for the idea that relating the profit to the injury would be measuring comparables. A corporation's relationship to its issued and outstanding stock is fiduciary. When a stockholder transfers his stock to another, the corporation's relationship remains intact. The

corporation itself has been deprived of nothing. It is my opinion that Congress in § 16(b) did not create in the corporation a new proprietary right in the stock, as against a stockholder or his successor, whether or not he is a "statutory insider". It created a bounty-like award for the target corporation which, like a public prosecutor, succeeds in bringing the one who violates the statute to answer for his wrongdoing. Its award attaches when it has succeeded. Interest, if any, should attach when and if this judgment order is entered in the plaintiff's favor and against the defendant.

Whether or not this logic is correct and controlling, prejudgment interest should not be awarded, in light of case law. Cases permit interest as a matter to be determined by the Court in exercise of equity only if the defendant's conduct has been reprehensible. The last case on the matter of 16(b) interest today is Gold v. Sloan, 486 F.2d 340, 353 (4th Cir. 1973).

In Gold v. Sloan both the majority opinion and the dissent agreed on the issue of interest. They observed that the trial court had allowed interest as a matter of course. The trial court's order had simply said that "interest on the amount of profit is a proper item of damage". Relying upon Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), the Fourth Circuit stated that:

> "The governing rule is that ' * * * "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. * * * "', * * * This rule has been followed in recent cases where interest was not awarded upon the showing of 'good faith' on the part of the defendant. Blau v. Lamb (D.C.N.Y., 1965) 242 F.Supp. 151, 161; Volk v. Zlotoff (D.C.N.Y., 1970) 318 F.Supp. 864, 867; Lewis v. Wells (D.C.N.Y., 1971) 325 F.Supp. 382, 387."

The Fourth Circuit said interest would be inequitable because it found in Sloan an absence of willfulness in the violation and an unavoidably lengthy proceedings. The Supreme Court in Blau v. Lehman, supra, ruled by analogy and set by its language the reasoning used by the Fourth Circuit.

For the same reasons, which I here adopt, as well as for the reasons I advance above, I hold that interest is not allowable in this case. Here there has been no showing of wrongdoing by the defendant.

It then appears that only one of these three collateral matters may figure into the profit. It is the expense amount of $2,875,872 incurred in the acquisition of Allis stock. This then would add to the purchase valuations before they are deducted from what is calculated to be the valuation assessed the sale to White Industries.

## RECAPITULATION AND CONCLUSION

To recapitulate, I have found the sale valuations to total $116,609,493. This is made up of the $20,000,000 received in cash by G&W, the $7,613,493 value of the unregistered White common stock received, and the $88,996,000 valuation of the $93,680,000 White Promissory Note accepted by G&W. I have found the purchase valuations to total $115,473,655, which amount includes the $2,875,872 stipulated with approval of the Court to represent the cost to G&W of engaging in its exchange offer and other negotiations. The total not including the costs, $112,597,783 is made up of three figures: the $34,500,000 cash given as part payment for the exchange offer purchase of the 3,000,000 shares of Allis' common stock, the $42,020,127 valuation placed upon the G&W warrants which went into the exchange offer, the $28,181,336 valuation placed upon the G&W debentures which also were part of the exchange offer, and the $7,896,320 valuation placed upon the acquisition by G&W of the 248,000 shares of Allis stock acquired from the Oppenheimer

Fund. The differences leave a profit by G&W to be accounted for to Allis in the amount of $1,135,838. This Court boasts no competency at simple mathematical computations, wherefore, subject to traditional re-examination of the arithmetic involved, it respectfully addresses to the parties this final determination.

In conclusion, the approach of the Court to this cause has been with an awareness that the corporate form of business enterprise increasingly serves the welfare of our modern society, but that the vitality and the integrity of that form must be protected against its use as a shield for wrongdoing. The statute called upon in this case is by legislative action an attempt on behalf of that society to provide by law that protection. It is an effort to monitor the conduct of those in positions of special knowledge of or control over a corporation's affairs. The business world has long been concerned about the statute itself. Some consider it too loose in its terms because it leaves too broad an area in which the courts may determine its proscriptions. Others also desire its repeal or revision because they consider it too severe. The SEC regards its administration a matter for the courts. Congress left its enforcement to corporate investors and provided therefor the exclusive jurisdiction of the federal courts and their traditional powers in equity. The courts in turn faithfully have sought to maintain the Congressional purpose without abandoning their basic principles of justice and fundamental fairness.

It has been held by the Court that in assessing profit, if any, it must make determinations of valuations as of the time of purchase and sale and in terms of fair market value (or fair value in the absence of market), and that such valuations must be realistic—not artificial. It has been determined that in 16(b) purchases by exchange offers it would be unfair to take into consideration the fact of arbitrage; and that dividends and interest are improper consid-

erations, but that if a defendant's conduct has been reprehensible, they are available to the Court for consideration to the end that the result be effectively remedial (never punitive).

In conclusion, it has been determined that the defendant, Gulf & Western, considering the size of its purchase, and the facts of its purchase and sale, became a statutory insider, and liable to turn over to the plaintiff its profit from the purchase and sale; but that it did nothing wrong, as far as speculative abuses are concerned. It has been found that judgment should be entered against the defendant, Gulf & Western, and in favor of the plaintiff, Allis-Chalmers, in the amount of $1,135,838.

Accordingly, it is so ordered, adjudged, and decreed.

This Memorandum Opinion and Order shall constitute my findings of fact and conclusions of law.